STATE *vs.* RICHARD E. BLOOD.

APRIL 27, 1944.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J. Indictment for murder. At a trial in the superior court a jury found the defendant guilty of murder in the second degree. The trial justice denied his motion for a new trial and thereafter he duly prosecuted to this court his bill of exceptions containing fifty-one exceptions which he is now pressing.

The present indictment was heretofore before this court on defendant's bill of exceptions and a new trial was then ordered. *State* v. *Blood,* 68 R. I. 160. The instant trial was held following the entry of that order. In general it is the contention of the state that in the early morning of September 5, 1940, on the premises at 22 Perrin avenue in the city of Pawtucket, where the defendant and his wife lived, he inflicted severe injuries upon her with malice aforethought, from which injuries she died at the Memorial Hospital in that city about 3 p.m. on the same day. The defendant, who was a witness, testified that he did not strike or injure his wife in any manner whatsoever and that he had no knowledge of how she received the above-mentioned injuries which caused her death. The evidence does show, however, that, in explanation of such injuries, he voluntarily asserted on various occasions and to different persons that she fell, either by accident or design, from a window in the room occupied by them on the third floor of the house on Perrin avenue onto a concrete driveway.

Shortly prior to the trial now under consideration the defendant, while he was held in the county jail without bail, moved that the instant indictment be dismissed because he had not been tried or bailed within six months of his plea thereto in accordance with general laws 1938, chapter 625, §57. This motion was denied by a justice of the superior court and his decision is the basis of the defendant-ant's first exception.

In this connection the following facts appear in evidence: On September 16, 1940 the defendant was indicted for the murder of his wife Muriel Blood. He was arrested under that indictment October 9, 1940, was arraigned the same day, pleaded not guilty and was committed to the county jail without bail, where he has remained except when he has appeared in the superior court. On December 3, 1940 he was placed on trial under this indictment in the superior court before a jury. That trial ended December 21, 1940, the jury returning a verdict that the defendant was guilty of murder in the second degree. On December 26, 1940 he filed his motion for a new trial, which motion was heard January 3, 1941 by the trial justice and was denied by him March 7, 1941.

Thereafter the defendant duly prosecuted his bill of exceptions to this court, and on June 18, 1942 its opinion was filed sustaining an exception to the charge of the trial justice and remitting the case to the superior court for a new trial. That trial, being the one now under review, was begun in the superior court November 23, 1942 and was concluded December 2 of that year. The defendant testified that during the period of his imprisonment he had requested many times to be released on bail, but that his requests had not been granted; also, that commencing December 27, 1940 and at different times during the succeeding two months, he demanded in writing of the trial justice and of the attorney general another trial under the indictment.

The defendant contends that it was error to deny his motion, because the state had not complied with the pro-

visions of §57, *supra,* in that he was not "tried" before the time set out in this section, which reads in part as follows: "Every person who shall be indicted for any of the crimes named in §17 of this chapter, and shall be imprisoned under the indictment, shall be tried or bailed within 6 months next after the time at which he shall plead to such indictment, if he demand a trial . . . ." Murder is one of the crimes named in §17. The defendant argues that a trial under that section means a trial according to law and that this court in *State* v. *Blood, supra,* decided that his first trial did not comply with that requirement, and that he was at that time not convicted according to law because the charge of the trial justice violated one of his fundamental rights. The defendant contends, therefore, that his first trial, by reason of said error, was merely a purported trial and that he was not lawfully tried within six months of his plea to the indictment.

We cannot accept as sound the defendant's above contentions. In our opinion, the trial which was held in the superior court in the month of December 1940 satisfied the provisions of article I, sec. 10 of our state constitution regarding the trial of criminal prosecutions, and also fully complied with the terms of §57, having been held with due formalities in the proper court before a jury within two months after the defendant had pleaded to the indictment. While this court later held that the defendant, because of prejudicial error in the charge, was not *convicted* according to law at his first trial, it did not hold, and it does not follow, that the defendant was not then *tried* according to law within the intent and meaning of the statute.

It is clear that the defendant was so tried. Section 57, which is designed to permit a defendant under certain circumstances to be tried or bailed within a specified time, does not directly or by implication provide that a trial, if otherwise properly held, shall of necessity be without error in order to be considered a lawful trial within the meaning of the statute in question.

We have carefully considered the authorities which the defendant has called to our attention as lending support to the position he has taken in arguing this exception. However, we find those authorities clearly distinguishable from the instant case. In this category we include the case of *Deslovers, Petitioner*, 35 R. I. 248. The defendant's first exception is therefore overruled.

In the present trial the trial justice, at the request of the state and over the defendant's objection, impaneled two additional jurors, making fourteen in all. These additional jurors sat and were kept with the others during the trial until the charge of the court was completed and the case was given to the jury for its consideration, at which time they were discharged. The action of the trial justice in impaneling these two additional jurors is the ground of the defendant's second exception. The statute under which the trial justice acted is public laws 1940, chapter 936, sec. 32½, and it reads in part as follows: "Whenever in the opinion of the court the trial of a civil or criminal case before a jury is likely to be a protracted one, the court may, immediately after the jury is impaneled and sworn, direct the calling of 1 or 2 additional jurors, to be known as alternate jurors."

In excepting to the impaneling of these two additional jurors the defendant's attorney gave as a reason for his action his opinion that the above-quoted statute was unconstitutional in respect to certain specified parts of the constitutions of the United States and of this state respectively. However, this point was not pressed in oral argument before us or in defendant's brief and is therefore deemed to be waived. Defendant urges in support of this exception that the trial justice should not have acted under the statute on the mere statement of the state's attorney that the trial might be a protracted one; but that the trial justice should have made a finding of facts to that effect, based on the showing and existence of sufficient circumstances, before he was justified in exercising his discretion as he did.

In our opinion, the trial justice did not abuse his discretion. While it appears from the transcript that little was said by the state's attorney or by the trial justice regarding the probable length of the trial, the record of the previous trial, which record was before him, showed that the first trial of the indictment covered a period of almost three weeks. We find nothing prejudicial to the defendant in the ruling on this point and the second exception is overruled.

Before any evidence was presented the defendant moved that all witnesses be sequestered except the chief of police of Pawtucket and all medical witnesses. The state's attorney asked that all police officers be permitted to remain in the courtroom on the ground that their presence was necessary for the proper presentation of the state's case. After argument the trial justice granted the defendant's motion in part, but declined to sequester any of the police officers. This ruling is the basis of the defendant's third exception. In our opinion, it would have been preferable if the trial justice had satisfied himself more fully, by inquiry or otherwise, that the continuous presence in the courtroom of all the police officers was necessary to the proper prosecution of the state's case. However, we have considered the transcript and defendant's arguments and have concluded that he was not prejudiced by the order of sequestration. We find, therefore, that the defendant's third exception should be overruled.

Defendant's exceptions numbered 4 to 25, inclusive, with the omission of 16, which will be dealt with hereinafter, and the omission of 20, 21 and 22, which the defendant expressly waives, relate to evidentiary questions raised during the trial and, in general, can be treated without detailed discussion. We have examined with care all these exceptions, other than those omitted as aforesaid, and find them to be without merit. In a few instances the exceptions under consideration may have raised arguable questions; but in no case, in our judgment, did the ruling of the trial justice amount to reversible error. However, we will refer to two

of the exceptions which the defendant has argued at some length.

Exception 4 relates to the admission in evidence, over the defendant's objection, of a window screen. Witnesses for the state identified this screen as having been taken from a window of the third floor room occupied by the defendant and his wife, which window was above a concrete driveway, hereinafter referred to in our discussion of the facts. The defendant denied that the exhibit was that screen. His principal objection to its admission was that there was a substantial change in the exhibit. In our opinion, it does not appear from the evidence that the screen as offered was so substantially changed from its original state that the jury would be misled by its admission as an exhibit. In any event, the defendant's objection goes to the weight rather than to the admissibility of the exhibit.

Exception 7 is to the admission in evidence of the report of the medical examiner after his autopsy on the body of defendant's wife. In support of his contention that such admission was error, the defendant has cited to us cases holding in substance that the report of a coroner's inquest is not admissible in evidence against a defendant in a homicide trial. Plainly these cases are not in point here. The report of a coroner's inquest and the report of a medical examiner's autopsy are clearly of such a different scope and nature that extended discussion of the point is not necessary.

Defendant's other grounds for objecting to the introduction in evidence of the above-mentioned report, namely, that it was not made in compliance with statutory requirements, and that approximately two typewritten lines of a report made to the medical examiner by a toxicologist were deleted by order of the trial justice, have no merit. Whether or not the evidence showed clearly that the medical examiner acted in strict compliance with the provisions of the statute in question is not important here. All the matters referred to in his report were fully testified to by him else-

where and the toxicologist also testified respecting his findings. Under all these circumstances, the admission in evidence as an exhibit of the medical examiner's report could not have prejudiced the defendant.

All of the defendant's exceptions numbered 4 to 25, inclusive, except those omitted from consideration, as hereinbefore specifically indicated, are overruled.

Exceptions 27 to 50, inclusive, are to the charge of the trial justice, and those numbered 51, 52 and 53 are to his failure to grant certain of the defendant's requests to charge.

Several of these exceptions may be considered together. Numbers 27, 28, 41 and 42 are to the portion of the charge wherein the trial justice read to the jury the complete statutory definition of murder as it appears in G. L. 1938, chap. 606, §1. The defendant's contention, in substance, is that such reading of the entire definition was misleading because it covered killings in the perpetration of or the attempted commission of certain felonies and in other situations, none of which were germane under the evidence herein, and because it tended to give the jury the impression that any killing which did not amount to first degree murder was, under the statute, second degree murder. Certain portions of the definition had no application in the instant case and might well have been omitted; but that is not to say that the entire reading would give the jury any such impression as claimed by the defendant. Moreover, upon consideration of the whole charge, wherein the trial justice explained fully the meaning of premeditation in its application to degrees of murder, we are of the opinion that the jury could not have been misled thereby, and that the defendant was not prejudiced by the action of the trial justice. In our judgment, there were facts and circumstances appearing in evidence which, together with the conduct of the defendant, would justify the charge as given. We find no merit in these exceptions as argued and they are overruled.

Exceptions 29, 44 and 47 are to the reading by the trial justice of a part of G. L. 1938, chap. 625, §11, in his charge,

and subsequently in compliance with the jury's request to have explained the definitions of first degree murder, second degree murder and manslaughter. That section authorized the jury, under certain circumstances, to find a defendant, who had been indicted, "guilty of such lower offense or guilty of an attempt to commit the same, as the case may be". As in the exceptions just considered the defendant contends that the reading of this statute tended to confuse the jury and to impress upon them that some kind of a conviction was required. In our opinion, this contention is erroneous. Such reading of the statute was pertinent and could not reasonably produce the results claimed by the defendant. Moreover, several times in his charge the trial justice stated clearly that the state had the burden of establishing, beyond a reasonable doubt, that defendant was guilty of an offense under the indictment; and that, under the circumstances, the defendant must be acquitted unless the jury excluded every reasonable hypothesis of his innocence. Exceptions 29, 44 and 47 are therefore overruled.

Exception 30 is to certain language in the charge defining and explaining second degree murder. In our opinion, the evidence permitted a charge covering offenses lower than the one specified in the indictment. *State* v. *Mahly,* 68 Mo. 315, relied on by the defendant in this connection, is therefore not in point. We have considered the above language objected to by the defendant and find that it is a proper definition and explanation of that degree of murder. This exception is without merit and it is overruled.

Exceptions 31, 45 and 46 are to that portion of the charge in which the trial justice defines malice and premeditation in their relation to a charge of murder. The use by the trial justice of certain terms and illustrations to help clarify the meaning of malice aforethought were entirely impersonal and general, and the jury could not have been misled into thinking that he was stating any facts that were established by the evidence or that applied to the defendant. These exceptions are overruled.

Exceptions 32, 33, 34, 35, 43, 48, 49 and 50 are to the part of the charge covering manslaughter. The defendant contends that it was error to make any charge on manslaughter in the present case because, under the evidence, such a charge was inapplicable; and if applicable was incorrect and misleading. If there was evidence which the jury might consider in determining whether the defendant injured his wife by the application of force so as to cause her death and whether such injuries were inflicted with or without malice aforethought, the trial justice was justified in charging on manslaughter. Moreover, the instructions in question when considered with other portions of the charge relating to the crime of manslaughter did not, in our judgment, mislead the jury and did not constitute error. We therefore overrule the above-numbered exceptions.

Exception 36 is to the remark by the trial justice in his charge to the general effect that the state "has given equal opportunity to the defendant for his defense as the State has provided for the Attorney General". Under the circumstances this remark, which apparently referred to comments made in argument by both the state and the defendant in respect to the weight to be given the testimony of certain opinion witnesses, may have been unnecessary. However, it does not appear that its effect was to belittle any contention of the defendant, as he argues, or that it misled the jury. If, nevertheless, the remark could be considered error, we fail to see how it was prejudicial error. This exception is overruled.

Exception 37 is to the statement in the charge that "The State has produced circumstances and exhibits which *they claim* taken together point unerringly to the defendant's guilt." (italics ours) The defendant's argument that this statement is unfair to him and that it amounted to approval of the testimony of the state's witnesses is tenuous and without merit. The trial justice merely stated that the above was the state's *claim,* and left its weight and correctness

to the determination of the jury. The defendant clearly takes nothing by this exception and it is overruled.

Exceptions 38, 39 and 40 are to the concluding portion of the charge in which the defendant maintains that the trial justice assumed as a fact that the defendant's wife came to her death as the result of the delivery of "the fatal blow or blows", leaving to the jury only the question of whether or not the defendant delivered such blow or blows. He contends that the language used in this connection by the trial justice virtually took from the consideration of the jury the question of whether or not defendant's wife came to her death accidentally or by her own act.

In our opinion, these contentions are not sound. On this point the charge as a whole must be considered. Immediately preceding the portion under discussion the trial justice had charged the jury that if it found that the state had not proved beyond a reasonable doubt that the defendant committed an assault upon his wife resulting in her death, then its verdict must be not guilty. The paragraphs objected to then followed, each starting with the phrase "If you find", and all of them clearly relate back to the part of the charge just referred to in which the jury was instructed to acquit the defendant unless it found that he had assaulted his wife. In view of the manner in which these statements were made by the trial justice it cannot reasonably be said that he assumed that her injuries were the result of a blow or blows inflicted upon her by another. On the contrary, in our opinion, the language of the trial justice is broad and general and left the jury free to decide whether or not she received such injuries by accident, by her own act, or by the act of another. On this view the charge did not take from the jury its right to decide how the defendant's wife received the injuries from which she died. Exceptions 38, 39 and 40 are overruled.

Exceptions 51, 52 and 53 are to the refusal of the trial justice to grant the defendant's fourth, seventh and eighth requests to charge, respectively. In our opinion, the fourth

request is defective in form, and the meaning thereof is as a whole confusing. The seventh request was sufficiently covered in the charge as given. The eighth request, so far as applicable, was also covered, in substance, by the trial justice in his charge. These exceptions are therefore overruled.

Exceptions 16, 26 and 54 will be considered together. The first is to the refusal of the trial justice to grant defendant's motion to dismiss at the close of the state's case; the second is to the refusal of the trial justice, on the defendant's motion, at the conclusion of all the evidence, to direct the jury to return a verdict of not guilty; and the third is to the denial by the trial justice of the defendant's motion for a new trial based on the usual grounds. A consideration of these exceptions requires a discussion of the evidence, which was circumstantial.

It appears that the defendant and his wife were married in 1934. They had no children. Since 1937 they had lived in Pawtucket with her family, the Jardines. At the time of her death she was about twenty-six and he was about forty years of age. Both were apparently in good health and the defendant was strong and athletically inclined. His wife was a few inches taller than he, but they were substantially of the same weight. They both worked, but at different places. He was a college graduate and a trained and experienced executive.

The Jardine family, together with the defendant and his wife, lived in the house at 22 Perrin avenue. The third floor thereof, which was occupied solely by the defendant and his wife, consisted of one very large room with four sets of dormer windows, one set on each side of the room. An enclosed flight of stairs, having uncovered wooden treads, led directly from this room on its north side down to the hall on the second floor. This stairway had a turn just before reaching the bottom. The bedrooms of Mr. and Mrs. Jardine, father and mother of defendant's wife, and of Gladys, another younger daughter, were on the second floor,

as was also the bathroom, which was used by all the occupants of the house.

In the sets of windows in the room occupied by the defendant and his wife all the windows had fixed sashes except one window in each set. Each of these last-mentioned windows had a hinge at the bottom, a catch at the top and opened inward into the room. Each was held open at an acute angle by a small chain, one end of which was fastened to the side of the window, the other end to a small plate, so called, which was screwed into the side of the window frame close to, and about level with, the top of the window. In the absence or unfastening of such chain, the window, if open, would hang down into the room as far as its hinge would permit unless otherwise obstructed. Each window had four small panes of glass, and outside of it was a wire screen, the wooden frame of which was fastened to the outside of the house.

The evidence shows that on the night of September 4, 1940 the defendant and his wife retired fairly early. She had been out that evening with friends. The defendant testified in substance as follows: He had viewed an apartment which had been advertised in a newspaper as being vacant. On his return he had then listened to the radio in their room while he waited for his wife to return. On the next morning he was awakened about 6:30 o'clock by the coughing and retching of his wife, who stated that she had been sick and had vomited on the pillowcase and sheet. He handed her some cleansing tissues and the wastebasket, and helped her to remove the pillowcase. He also "rubbed" her back, explaining that he had done so before, since it tended to soothe her. He then got up to dress, although it was earlier than his usual time for rising, and went downstairs to the bathroom. The ordinary routine was for Mr. Jardine to use the bathroom first. While the defendant was there Mr. Jardine, who also was employed, came to the door and asked him to draw some water for a bath. In a short time the defendant, after drawing the water as re-

quested, left the bathroom, looked into the bedroom of Mr. and Mrs. Jardine, and, according to his testimony, went downstairs.

According to other evidence Mr. Jardine had previously gone downstairs, first to the kitchen and then to the living room in the front part of the house, where he sat down and smoked a cigarette. He was somewhat deaf and generally wore an apparatus to improve his hearing, but he was not wearing it that morning. According to the testimony of Mrs. Jardine and her daughter Gladys they heard the defendant go from the bathroom upstairs to the room occupied by him and his wife. Gladys was then in bed and was awake, but the door of her room was closed. This door was near the foot of the stairs which led to the third floor, and anyone using such stairs had to pass it. At the bottom of these stairs was another door which opened against a stop to prevent its hitting the wall of the second floor hallway. Gladys testified that soon after the defendant had gone upstairs she heard a peculiar noise, which she was unable to describe with particularity, but which definitely came from a point near the corner of her room approximately where the enclosed stairway to the third floor turned and was separated from her room only by a wall. She further testified that she then knelt on her bed and looked out of a window from which she could see about three-quarters of the length of the cement driveway which extended along the north side of the house to the garage, but observed nothing on the driveway. She then lay down again and a short time thereafter was aroused by cries from the first floor of the house, whereupon she hurried downstairs.

The defendant testified, in substance, as follows: After leaving the bathroom and looking into the bedroom of Mr. and Mrs. Jardine he did not go upstairs, but immediately started toward the first floor to prepare some breakfast; and as he was proceeding down the stairs he saw through the Venetian blinds, which were on a window above a landing, a figure lying on the cement driveway, which figure

he recognized as that of his wife. He thereupon hurried down these stairs and down another short flight which led to a door opening onto the driveway at approximately the ground level, and found his wife, barefooted and clad only in her pajamas, lying on her back in the driveway. She was moaning and apparently unconscious. He at once lifted her up and, with some difficulty, carried her through the said door and up the short flight of stairs to a small hallway which was between the kitchen and the main hall in the front part of the house. In this hallway he placed her on the floor and called for help and for Mr. Jardine. No witness, other than the defendant, testified to seeing her lying in the driveway, although Perrin avenue is closely built up and the house immediately north of the Jardine's driveway was separated from it by only the width of a similar driveway and had windows on that side.

Mrs. Jardine and Gladys came first and the latter called her father. It was seen that the defendant's wife was badly injured. She was removed to a couch in the living room and, according to the state's evidence, when Mr. or Mrs. Jardine directed Gladys to call a doctor the defendant ordered all of them from the room, saying, in substance, that she was his wife and that he would look out for her. When the doctor came the defendant talked with him alone in the living room. Thereafter the doctor sent for an ambulance and she was taken to the Memorial Hospital. This doctor never testified because he died before the first trial. The defendant, who had gone upstairs to shave, although notified of the arrival of the ambulance, did not accompany his wife to the hospital. There X-ray pictures were taken and she received a blood transfusion and certain other treatments; but she died about 3 p.m., without regaining sufficient consciousness to tell what had happened.

The medical examiner performed an autopsy in connection with which certain other tests were made. He reported that the defendant's wife died from shock and hemorrhage, and the following severe specific injuries: several fractured

ribs on the left side of her body, a laceration of her left lung, a severely lacerated spleen, two lacerations of her liver, and an irregular laceration of her left kidney. There was also considerable free blood present in both the abdominal and the thoracic cavities. There was an extensive black-and-blue area on the left buttock, a small abrasion above the hairline in the right temporal region; a bruised area and brush burn on the posterior right arm; an abrasion on the inside of the right ankle; and a bruised area over the right inferior scapula.

The state contends that the evidence taken as a whole shows a connected chain of circumstances which establishes its theory that the defendant committed a violent assault upon his wife in their bed early in the morning of September 5, inflicting upon her the above injuries with malice aforethought for an appreciable time, and that he then moved her to the lower hallway where the members of her family first saw her.

A careful consideration of the transcript shows that the defendant, at least outwardly, displayed little or no grief at his wife's injuries or later death and that he apparently acted at all times with self-control and deliberation. He gave the following testimony under cross-examination: "Q. You are a pretty calm fellow aren't you? A. I have schooled myself to be that way. Q. You have done what, please? A. That has been my training. Q. Any particular reason for it? A. Well, it is the way I have been brought up."

There was evidence that the pajamas which the defendant wore on the night of September 4 were not placed in his laundry with his other soiled clothing for Mrs. Jardine to wash, as had been his regular custom; and that on the night of September 5, after he knew that the police were interested in his explanations and before they had completed their investigation, he burned considerable material in an outdoor fireplace on the Jardine premises. The defendant never offered these pajamas in evidence.

The uncontradicted evidence shows that before the autopsy was performed, and before the defendant knew there was to be one, he suggested to the Jardines, when arrangements for his wife's funeral were under consideration, that her body be cremated. His only excuse for making this suggestion was the saving of expense, but it does not appear that cremation would effect any saving and, as a matter of fact, the evidence shows that the Jardines paid the expenses.

The evidence also shows the following entry on the record of the hospital: "History obtained was that patient had fallen from a third story window of possible suicidal intent and that for some time previous to admission, patient had been rather mentally depressed". While the defendant testified that he did not recall giving such information, the evidence clearly shows that it was not obtained from any person other than the defendant. Similar explanations of his wife's death had been made by him to numerous persons at different times. Aside from his statements, however, there was no evidence to support any such facts.

Mrs. Jardine and Gladys testified that while the defendant's wife was lying on the floor in the small hallway where they first saw her after she was injured, they asked the defendant what had happened and he said that she had fallen out of the window. According to the state's evidence, in answer to a question from Mr. Jardine, the defendant said that his wife had stated to him that she did not want to live. An insurance agent, who called on the defendant at the Jardine home on the day following her death, in order to facilitate the making by defendant of the proof of death, preliminary to the collection of insurance on his wife's life, gave the following testimony regarding a statement made to him by the defendant: "Q. Whether or not he said to you, 'My wife committed suicide, very despondent, and she threw herself out of the window,' and pointed out the window to you? A. He did, sir, as we went through the completion of the proof of death." This took place on the very next day

after defendant had been told by the medical examiner that there was to be an autopsy. To police officers during their investigation the defendant stated, according to their testimony, that he had left his wife in bed and that she had fallen from the third story window.

In other words, the defendant's first explanation of his wife's injuries was that she had fallen, either by accident or with suicidal intent, from their bedroom window onto the cement driveway, a distance of about twenty-one feet. That he had made such statements or ones of a similar nature was not seriously disputed by him and, in any event, was amply established by the evidence.

It further appears from the evidence that the window in question, which faced north over the driveway, was the only one on that side of the room which did not have a fixed sash and that it was only 22½ inches wide and 22¼ inches high. Upon examination by the police and others soon after the defendant's wife was taken to the hospital it appeared that the plate or bracket, so called, had been unscrewed from the frame of this window, thus preventing the chain fastened thereto from holding the window at an acute angle. Under such circumstances the window, when opened, rested approximately parallel to the floor on a balustrade of the staircase which led to the second floor.

On the corresponding windows on the other three sides of the room the plates were all screwed into place, causing the chains connected therewith to hold the respective windows open from the top inward at an acute angle. The state's evidence showed that the defendant told the police that during the summer, while the weather was warm, all the plates had been unscrewed so that the windows might be opened to their fullest extent in order to permit a free circulation of air; that a night or two before his wife was injured he started to screw all the plates back into place; that he had completed work on three of the windows and that he "must have been interrupted" before screwing back the plate on the window in question.

The plain inference from this was that there was no longer need or desire for the full opening of any of the windows, and that, except for the alleged possible interruption, he would have screwed the plate back on the window in question. He also told the police, according to their testimony, that when he first returned to his room that morning, after his wife had been placed on the couch in the living room, he had seen a screw driver "on top of the window sill"; that he purposely placed it out of sight because he thought his wife might have used it to stab herself, and he did not want it thought that she might have committed suicide; that "it was his wife who had unscrewed the screws, and he said he thought she had done that with the intention of going out the window". This screw driver was not revealed to the police by him until a day or two after his wife's death and the screws for this plate were not accounted for by him for several days thereafter when he told the police, as testified to by them, that they were "on the window sill above that window". The police found the screws there but several officers testified that they were not there when the room and the window were examined by them on previous visits.

In addition, it appeared from an examination made a few hours after the defendant's wife was injured that there was a wire screen outside the said window. The upper left-hand portion of this screen was somewhat loose and hung away from the window a few inches at an angle, but the remainder was apparently firmly fastened to the house outside. This screen was later removed by a police officer, and it was so securely attached that in making the removal he tore part of the wire mesh and broke off part of the frame of the screen on the top and right side, the broken portions remaining attached to the house. There was testimony from police officers that no fingerprints were obtained on September 5 from around the window and window sill, and that the dust thereon apparently had not been recently disturbed.

Notwithstanding his numerous explanations and statements that his wife had fallen out of that window, the de-

fendant testified in cross-examination as follows: "Q. I believe you testified that even a dog couldn't go through the opening in the screen? A. The opening in the screen? Q. Is that correct? A. That is correct. Q. Do you want to leave it with the jury now, it was impossible for your wife to go out through the screen? A. Through the screen, yes. Q. You want us to believe now your wife did not go out through the window? A. She pushed the screen to one side. Q. You are sure she went out through the window? A. If she did. . . . Q. How do you want to leave it now, that your wife got out, or didn't get out that window? A. My opinion—You are asking my opinion? I cannot form an opinion without finding all the facts. That is what I want to find. . . . Q. Will you deny that during the entire interrogation with the police in this case, that you took the position that your wife had fallen out of the window in an attempt to commit suicide? A. Up until the 10th of September, the evidence I had seen firmly convinced me of that. On that day in the talk with Dr. Krolicki he explained and outlined and covered in detail the different situations which would be an accident, and then is when I changed my mind from the positive frame of mind I had been up to that time."

Inspector Bliss testified as follows concerning statements made by the defendant at the police station: "On the 10th of September Mr. Blood came to the police station, and in the presence of Chief Mills and Inspector Truesdale and myself, he said that he had been talking to Dr. Krolicki about this thing, and he felt in his own mind it was humanly impossible for anyone to go out that window as it was the morning that this thing was supposed to have happened, and that when he went back to the room he figured it was impossible for anyone to go out this window." Inspector Truesdale testified as follows in connection with the same matter: "Q. As a matter of fact, Inspector, the defendant himself told you that he didn't think it was possible for Muriel to go out of the screen? A. Four days later he did. He told me after viewing

the window that he thought it was physically impossible for her to go out that window."

The evidence disclosed that the pinkish stains on the pillowcases and sheet from the bed of defendant and his wife were blood stains. It was the state's contention that the stains were due to a hemorrhage from the laceration of her lung thereby causing blood to come from her throat and mouth. While tests were made of such a small amount of the stain and one test at such a late date that the examiner was unable to testify positively that the blood was human blood, nevertheless the defendant's own testimony showed beyond any doubt that whatever was found in that stain had actually come from some internal organ of his wife.

Expert medical testimony was presented by both the state and the defendant. Witnesses for the state testified, in substance, that the injuries of defendant's wife were not consistent with a fall or a single impact, but were due to pressure or applications of blunt force by a hard, smooth object or objects, which force must have been applied with great intensity in order to cause such severe and extensive injuries to different vital organs. These witnesses also testified that such force could be applied in a manner which would leave marks externally in some places and not in others. They also likened her injuries to those received by one violently squeezed between two hard objects and also to those received in a "torture chamber", but not from a free fall.

Each of several doctors testified for the defendant that, in their opinion, the injuries received by the defendant's wife were the result of a single application of force to the left buttock, where a large bruised area appeared, and that this force was transmitted first to the abdominal cavity and then to the chest cavity, causing, by pressure or compression of the two cavities one upon the other, ruptures of the organs and fractures of the ribs. The application of such a single force or impact, in their opinion, was consistent with a free fall of ten to twenty feet to a hard surface with a definite landing on the left buttock while the body was bent forward in a so-called jackknife position, but was inconsistent with

an ordinary fall to the ground or down a flight of stairs. The substance of their testimony was that if there had been multiple applications of force to different parts of the body they would expect to find more external bruises immediately over the parts injured. But this was admittedly not true in all cases and their testimony did not negative a conclusion that such injuries could result from multiple applications of force of sufficient intensity to one or two areas of the body while being held in such jackknife position.

We have not attempted to discuss all the evidence in the case, but our consideration thereof leads us to the conclusion that the decisions of the trial justice denying the defendant's motion to dismiss at the conclusion of the state's case and his motion for a directed verdict of acquittal were without error. The state, in our judgment, presented a series of connected circumstances which required that the case be submitted to the jury to determine whether or not the defendant was guilty of the crime with which he was charged. Defendant's exceptions 16 and 26 are therefore overruled.

Exception 54 is to the denial of defendant's motion for a new trial. The jury and the trial justice had the advantage, which we do not have, of seeing and hearing the witnesses testify. In denying the motion for a new trial the trial justice stated that he was favorably impressed by the state's witnesses and their testimony and also expressly found that the defendant was evasive and contradictory in his answers. Under our well-settled rule we do not disturb the decision of a trial justice on a motion for a new trial, unless we find that such decision is clearly wrong or that he has overlooked or misconceived material evidence. We have carefully considered his decision and all the evidence in this case and we are of the opinion that in reaching his final conclusion he did not overlook or misconceive any material evidence.

In determining whether, in our judgment, the decision of the trial justice was clearly wrong the following facts, among others, are important: the arrangement of the house at 22 Perrin avenue and the location therein of its various occu-

pants; the sequence of events before and after the occurrence in question on the morning of September 5; the size, location and arrangement of the window in question, and especially the fixed position and condition of the screen outside of such window soon after the defendant's wife was injured; the statements by the defendant, admitted by him or otherwise established; his questionable conduct and explanations before and after the event; other facts in evidence bearing on the peculiar construction of the interior of the house and the enclosed stairways; and the nature, extent and evidences of his wife's particular injuries. These facts, considered as a whole, amply justified the jury in concluding beyond a reasonable doubt that it was physically impossible for her to have received such injuries by reason of a free fall from the window in question, either by accident or with suicidal intent.

Indeed, the defendant himself, who had first affirmatively claimed that his wife had fallen from that window to the driveway and that he picked her up therefrom outside the house, nevertheless before the trial was concluded admitted that it was impossible for her to have gone through the window in question with the screen in the condition and position in which it was found to be. Moreover, the evidence amply justified the jury in finding beyond a reasonable doubt that it was wholly improbable, if not physically impossible, for defendant's wife to have received such injuries by reason of a free fall down a stairway or by reason of any other fall inside or outside the house.

From all the evidence the jury and the trial justice were justified in concluding that it was proved beyond a reasonable doubt that the defendant had committed a violent assault upon his wife causing the injuries which resulted in her death, and in concluding that any other hypothesis was wholly unreasonable on the credible evidence and was therefore properly excluded by them.

Whether or not in committing such assault he acted with any degree of premeditation or malice, so as to distinguish

his act from manslaughter, was primarily a question of fact to be determined by the jury. On this question it was entitled to draw reasonable inferences from all the facts and circumstances appearing in evidence and to weigh them like any other evidence.

It is impossible to set out fully all the various facts and circumstances proved, or to group them in relation to each other and to the conduct of the defendant in a way that would adequately show their full cumulative force and effect. In a general way, however, on the issue whether the defendant acted with premeditation or malice aforethought, the evidence was such that the jury was entitled to find beyond a reasonable doubt, among other findings, that at least as early as the night before the assault he had deliberately refrained from replacing the screws and the plate that held the chain on the window in question; or that, after such plate and screws had been replaced on this as on all the other windows in the room, he had unscrewed them; and that in either case the defendant's action was deliberate, was not due to his alleged but unexplained interruption, took place *before* the assault, and was for the sole purpose of carrying out some design to use that window either to assist him in later effectuating his wife's death, or in preparing in advance some evidence which would appear to support the explanation which he planned to give after he had completed the intended assault. The jury could believe, from the season of the year and from defendant's own testimony to the effect that he had intended and had started to fix the plates and chains on *all* the windows, that there was no longer any need or desire to have the window in question fully opened for additional circulation of air, and there was no credible evidence of its use for any other purpose.

The jury could also have considered such facts with other evidence to the effect that he concealed the screw driver and screws; that he failed to account for or produce them until several days after he was first questioned by the police and medical examiner; that his only excuse for this failure

was his desire to prevent any implication that his wife had committed suicide, notwithstanding he himself had previously asserted to the police and others as a fact that she had fallen from that window with suicidal intent,—a fact which even he later admitted was impossible in the circumstances; that he, not the family, had suggested cremation of his wife's body *before* he knew an autopsy was to be performed; and that on the very next day *after* he had learned from the medical examiner that there was to be an autopsy, he executed a proof of his wife's death in order to collect insurance on her life, at which time he deliberately misrepresented to the insurance agent that she had fallen from that window with suicidal intent.

The jury had just cause to believe these and other facts and to conclude that the defendant had premeditated the killing of his wife as early as the night before the assault. However, even if such facts were insufficient to establish premeditation beyond a reasonable doubt for such a long duration, they at least, in conjunction with additional facts in evidence, justified the finding that defendant acted with malice aforethought for some appreciable time. These additional facts and circumstances included, among others, the peculiar nature, extent and diversification of his wife's injuries; the defendant's high degree of intelligence and education; his admitted training and custom to act calmly and deliberately; the absence of evidence to show any panic or substantial grief on his part; his deliberate misrepresentations in explaining to numerous persons the cause of his wife's death; and his studied evasion of questions as evidenced throughout the record.

The severe force, whether of one or more applications, which the jury could reasonably find was necessary to cause the peculiar injuries described in the evidence would plainly justify it in concluding that the defendant acted deliberately in assaulting his wife; that he did not act hastily in a momentary heat of passion or emotion; that the injuries which caused her death were the natural and necessary result of

continued intensive application or applications of force; and that the very nature and extent of her injuries in the circumstances required the continued administration of force for such an appreciable time that the defendant had ample opportunity to reflect and did reflect sufficiently, but nevertheless willfully carried to a conclusion his malicious assault. On such a view of the evidence the jury was justified in finding beyond a reasonable doubt that the defendant, in assaulting his wife, acted with malice aforethought for such an appreciable time as to warrant a verdict that he was at least guilty of second degree murder. This conclusion is further confirmed by the undeniable fact that there is absolutely no credible evidence or suggestion in the record or brief or argument of the defendant to show any provocation or justification for an assault, or to show any extenuating circumstances in connection therewith.

When all the facts bearing on the question of malice are considered together, the jury was justified in finding beyond a reasonable doubt that the defendant had inflicted injuries upon his wife through force administered in a peculiar manner, with such cruelty and intensity, and for such an appreciable time, as to establish that her injuries had been inflicted by him with a wholly willful, wanton and reckless disregard of the natural and necessary consequences of his assault; and that any other hypothesis inconsistent with such conclusion would be unreasonable and was therefore properly excluded. In our opinion, the evidence fully justified the trial justice in denying the defendant's motion for a new trial. Exception 54 is overruled.

The defendant has contended that he was prejudiced by reason of certain markings on the wrappings and on the envelope containing exhibits which were taken into the jury room, which markings were not discovered until the case was in this court. Assuming that this question is properly raised, the contention, in our opinion, is without merit.

Moreover, since the argument here, the clerk of this court received a personal communication from the defendant en-

closing his affidavit of so-called newly discovered evidence and asking that it be transmitted to us for our consideration. Such action is highly improper and, perhaps, should be entirely disregarded. However, we have inspected the affidavit; but we find nothing therein which legally amounts to newly discovered evidence.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

CONDON, J., dissenting. I dissent because, in my opinion, the evidence does not exclude to a moral certainty every hypothesis but that of the defendant's guilt of murder. In a homicide case where the evidence is entirely circumstantial, as it is here, such evidence must exclude every other reasonable hypothesis than the defendant's guilt. On the view which I take of this evidence there is a reasonable hypothesis other than murder to account for the killing of Muriel Blood, namely, manslaughter.

The state's proof of defendant's connection with his wife's death rests entirely upon circumstantial evidence. Only by inference from such evidence can it be determined how she received the injuries from which she died, whether they were inflicted upon her by some other person, by what means they were inflicted and who was such other person. The state's proof of the intent with which they were inflicted is likewise dependent solely upon inference. It is without the aid of evidence of either a motive for the crime on the part of the defendant or of the use by him of a dangerous or deadly weapon. While proof of either is not essential to proof of the crime, it is of great help to the state in a case of circumstantial evidence solely.

The absence of proof of motive in such a case is, on the other hand, a circumstance in defendant's favor. It has been said on good authority that: "It is in cases of proof by circumstantial evidence that the motive often becomes not only material, but controlling . . . ." *People* v. *Bennett,* 49 N. Y. 137, 149. And in *People* v. *Lewis,* 275 N. Y. 33, 42, the court stated: "The evidence as a whole establishes a

strong lack of motive and its absence is a powerful circumstance in the exculpation of the defendant where reliance is placed entirely upon circumstantial evidence to establish the crime."

Motive becomes especially important in such a case where the accused is related to the victim of the homicide by close ties of consanguinity or affinity. Murder is a gross violation of the natural law and never more so than when it invades the sacred precincts of the family. So when an accused is charged with the murder of his wife and the proof of such charge rests solely upon circumstantial evidence, as in this case, the absence of any evidence of a motive for the crime is entitled to great weight.

The evidence here strongly establishes lack of motive and presents a strange case indeed of uxoricide. When a husband kills his wife, the mind almost instinctively seeks for a motive for so revolting a crime. And usually in the denouement of such a tragedy evidence of marital discord is not wanting in unlocking the mystery. In this case there is no such evidence. For aught that appears from the record, defendant was happily married. Not even by inference is there any evidence to the contrary.

In the absence of proof of motive it is most difficult to infer from the circumstances here that the defendant, intended to murder his wife and that he attacked her with such intention. It must be borne in mind that, in order to convict him of murder, the state's evidence must prove beyond a reasonable doubt not only that he inflicted the injuries from which his wife died, but also that he intended to kill her at the time he inflicted them. In this connection much has been made of defendant's statements as to how, in his opinion, his wife met her death. The state contended that those statements amounted to a studied attempt on his part to deflect suspicion from himself and that they thus showed his consciousness of guilt. It is true that such evidence weighs against him, but we should be on our guard lest we allow it to weigh too much so that it becomes sub-

consciously in our minds conclusive proof of defendant's guilt. This, I think, the jury did.

Almost a century ago in *Commonwealth* v. *Webster,* 5 Cushing 295, 316, *Shaw, C. J.,* while recognizing the probative force of such evidence, wisely cautioned as follows: "To the same head may be referred all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations, and to cast suspicion, without just cause, on other persons: all or any of which tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs. Such was the case often mentioned in the books, and cited here yesterday, of a man convicted of the murder of his niece, who had suddenly disappeared under circumstances which created a strong suspicion that she was murdered. He attempted to impose on the court by presenting another girl as the niece. The deception was discovered and naturally operated against him, though the actual appearance of the niece alive, afterwards, proved conclusively that he was not guilty of the murder."

In the instant case I am not prepared to say that the evidence raises any other reasonable hypothesis than that the defendant inflicted the injuries from which his wife died. But whether a further inference may be superimposed thereon that he intended to kill his wife when he inflicted such injuries is doubtful. In any event, the evidence does not, to a moral certainty, exclude another reasonable inference, namely, that he did not have such intent. Here there is no presumption of such intent from the inferred assault, as in the case of the use by the accused of a deadly or dangerous weapon in committing the assault. We are dealing here merely with a series of inferences which, while they may point unerringly to the actor who has committed the

act, do not necessarily show the intent with which the act was done. This latter fact does not lie in the field of inference on the evidence here but remains out of reach in the realm of speculation.

In a case of this kind, whether there is any evidence sufficient to prove that defendant had the intent to kill is a matter of the first importance. This has been recognized even in a case where there was direct evidence of defendant's assault upon his wife by use of a dangerous substance which caused her death. See *Commonwealth* v. *Kluska,* 333 Pa. 65. In determining that question in the instant case the jury was bound to give the defendant the benefit of the doubt, if the evidence did not exclude to a moral certainty every other reasonable hypothesis. Only by so doing would they be giving him the full benefit of the presumption of innocence to which he was by law entitled. That presumption exists both as to the homicidal act and the homicidal intent. It follows and protects the defendant even after the act is admitted or established and until the intent is proved.

Out of tenderness for the frailty of human nature, as it has been said, the law palliates the criminality of the act of taking life until the proof appears that the act was accompanied by an intention to take it. And even then, if the taking was done in sudden passion upon grave provocation, the law relaxes its rigor and regards the killing as not murder but the lesser offense of voluntary manslaughter. Where there is no proof of intent to kill but death has resulted from an unlawful act not itself a felony, the killing is deemed involuntary manslaughter.

In my opinion, there is practically no evidence in this case from which an intent to kill on the part of the defendant can be reasonably inferred. If there is any, it is very meagre and consists in a pyramiding of inferences which furnishes a doubtful basis, to say the least, from which to draw the ultimate inference of such intent. On the other hand, it is entirely reasonable to infer from the evidence that defendant did not intend to kill his wife when he as-

saulted her. Keeping in mind the presumption of his innocence and the absence of any independent circumstance that substantially rebuts it, the fair inference is, not that he intended to kill his wife but that he unwittingly exerted such force in the assault as to injure her fatally, and that upon seeing blood coming from her mouth, he then realized for the first time that he had gone further than he intended and was thus put in great fear of what might follow.

It may be asked how such a view can be reconciled with defendant's testimony of finding his wife lying in the driveway or with his suggestion that she may have jumped from the window. The answer is, in my opinion, panic. That is a common aberration in physical crises and it is not uncommon in moral crises also. The instance given by Chief Justice Shaw in *Commonwealth* v. *Webster, supra,* is a good example.

In the instant case the defendant was faced with a great moral crisis, probably the greatest that can come to man upon this earth, the charge of responsibility for another's death. In that crisis whatever fortitude he possessed crumbled almost at once. Realizing the serious consequences that might follow his assault upon his wife, he saw the finger of suspicion pointing at him and he strove to turn it away. In the awful hour of accusation which he foresaw looming up before him and which ultimately struck he lacked the moral courage to confess the lesser wrong he had done. Had he then confessed the truth instead of striving to shunt suspicion from himself he might well have avoided the charge of murder. As it was, all his contriving but left him open to the suspicion that he was the evil-minded perpetrator of that greater wrong, and the state so accused him. Gripped in the vise of fear he fabricated an unbelievable story. The tangled web of deceit which, in sheer panic, he sought to weave about himself as a shield has become a trap. As a result largely of such folly he has been convicted of a greater crime than the evidence proves he committed. For that folly, however, he should not be

thus condemned as a murderer. He should be judged only on his state of mind at the time of the assault and not on what he said or did thereafter, unless such words and deeds convincingly disclose a guilty intent to kill contemporaneous with the guilty act.

In the situation in which he was placed on the morning of September 5, 1940, it is almost inconceivable that the defendant then and there intended to kill his wife. There she was under her father's roof and practically in the bosom of her family. It was then the very time of day when members of the family were rising and stirring about the house. In such circumstances it is difficult for the mind to credit one with meditating the crime of murder and then committing it. It is doubly difficult to believe with moral certainty that a normal, happy husband would meditate such a foul deed and carry it into execution almost within sight and hearing of his wife's kindred. The more reasonable conclusion and one to which the mind can readily come without moral hesitancy is that an unlawful assault has had an untoward fatal ending and that the defendant is guilty at most of involuntary manslaughter.

In my opinion, we ought to, if we may, reduce the conviction to manslaughter or at least order a new trial.

*John H. Nolan,* Attorney General; *John O. Pastore,* Assistant Attorney General; *John J. Cooney,* for state.

*Benjamin Cianciarulo,* Public Defender; *Aram A. Arabian,* for defendant.