STATE

v.

Elvidio REYES.

No. 96–79–CA.

Supreme Court of Rhode Island.

Jan. 14, 1998.

Annie Goldberg, Aaron L. Weisman, Providence, for plaintiff.

Janice M. Weisfield; Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Although the Bible teaches that "The wicked flee when no man pursueth: But the righteous are bold as a lion,"[1] courts have been unwilling to treat evidence of an accused's flight from a crime scene in such categorical terms. *See, e.g., Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896) (an accused's mere flight from the crime scene, while relevant to the question of guilt, is insufficient to raise a presumption thereof). On the other hand we have long recognized that flight evidence may be considered by the jury because it has some bearing upon the question of a defendant's consciousness of guilt for having committed the underlying crime.[2]

In this case we must determine whether the conduct of defendant, Elvidio Reyes (Reyes), permitted the trial justice to instruct the jury that it could consider Reyes' flight from a murder scene as bearing upon the issue of whether Reyes was conscious of his guilt for having committed this crime. On appeal from his first-degree-murder conviction, Reyes contends that the state presented insufficient evidence at trial to support the trial justice's brief instruction to the jury on this issue.[3] Because the evidence shows that immediately after the murder

1. Proverbs 28:1.

2. As this court said in *State v. Falcone,* 41 R.I. 399, 401, 103 A. 961, 961 (1918), "[T]he State may show that [the defendant's] flight after the time when the crime was committed, not because it raises a legal presumption of guilt, but because it is a circumstance bearing upon the question of the [defendant's] guilt which may be presented for the consideration of the jury." *See also State v. Cooke,* 479 A.2d 727, 732 (R.I.1984); *In re Caldarone,* 115 R.I. 316, 326, 345 A.2d 871, 876 (1975) (citing *Falcone); accord* 2 Wigmore,

*Evidence* § 276 at 128 (1979 & Supp.1997) (the principle that flight evidence is admissible as evidence of consciousness of guilt "has been sanctioned so many times that its frequent modern repetition has become redundant").

3. In his jury charge the trial justice stated: "You may consider in your deliberations the flight of a defendant. The flight of the defendant bears upon his consciousness of guilt. Flight may be considered on the issue of whether the defendant is guilty or not guilty."

Reyes left the crime scene, sought and obtained temporary refuge in a friend's house, and, while there, took further steps to arrange his getaway, we dismiss the appeal and affirm the conviction.

### Facts and Travel

On the morning of October 19, 1993, Reyes and Gregory "Cola" Frias (Frias) were riding together in a vehicle with Franklin Deshamps (Deshamps) and a fourth individual known only as Ruffino. Reyes and Frias began to argue, Frias slapped Reyes in the face, and Reyes attempted to retaliate in kind. Eventually Frias and Deshamps exited the vehicle at Deshamps' home. A short time passed while the two men just stood there, conversing, outside Deshamps' garage. Suddenly Reyes returned on foot, confronted Frias, and gestured as if to draw a weapon. This movement caused Frias and Deshamps to bolt in opposite directions. After hearing gunshots, Deshamps turned and ran back to find Reyes standing over Frias' prone body. Frias had two fatal gunshot wounds in his back. Immediately thereafter, Reyes left the scene—and although the two of them had been friends, Deshamps never saw Reyes again until the trial.

At around noon on the day of the shooting, Reyes appeared at the home of Annette Esteva (Esteva), the wife of a friend. Reyes stated that he was being chased and asked if he could come inside. Esteva noticed a scratch on Reyes' face and observed that he appeared scared. Although, as Esteva noted, Reyes' clothes did not appear to be torn, dirty, or wet, he nonetheless asked if he could borrow some of her husband's clothing as well as some vinegar. Reyes then entered the bathroom. When he emerged, he was crying, and he asked if he could lie down for a while. (Later Esteva discovered that Reyes had vomited into her bathtub.) After resting briefly, Reyes solicited a car ride from one of Esteva's visiting friends and offered to pay for the gas. When the friend declined, Reyes left Esteva's home, wearing her husband's apparel and leaving his own clothes behind.

Five months later a Providence police detective located and photographed Reyes in Lawrence, Massachusetts. When the detective approached him, Reyes provided a false name and denied his true identity. The detective returned to Rhode Island and presented the photographs he had taken to Deshamps and Esteva, who then identified Reyes as the person in the pictures. Reyes was later apprehended and, after a jury trial, convicted of first-degree murder for killing Frias.

### Analysis

Reyes' sole objection to the jury charge, both at trial and on appeal to this court, is that his mere presence in Massachusetts some five months after the shooting was not indicative of flight and therefore should not have been allowed to trigger the court's jury instruction on this point.[4] But this is not a case in which Reyes' belated presence in Massachusetts was the only evidence to justify the court's flight instruction. Here the prosecution presented evidence detailing Reyes' presence at and immediate departure from the crime scene after the murder. Most tellingly, the jury also heard about his later actions at Esteva's home, including his solicitation of new garb and of a ride in an automobile in exchange for gas money. Satisfaction of one or both of Reyes' requests would have helped him to distance himself from the corpus delicti. In our judgment such evidence is more than adequate to support the barebones flight instruction that was given here.

■ In *State v. Cooke*, 479 A.2d 727, 732–33 (R.I. 1984), we explicitly adopted the pre-

---

4. Notably the jury instruction in question failed in any way to make reference to Reyes' presence in Massachusetts some five months after the shooting, much less did it suggest that this evidence was indicative of his flight from the crime scene. And although Reyes made a timely objection to the jury instruction, he never objected to the introduction of the evidence about his being located in Massachusetts some five months after the murder. Rather the only issue he raises on appeal is the purported lack of evidence supporting the court's flight instruction. *See State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996) (noting that Super.R.Crim.P. 30 requires a party to state " 'distinctly the matter to which the party objects and the grounds of the party's objections' "). Reyes also did not object on the grounds that the form of the flight instruction was deficient. Accordingly we express no opinion about its form or content.

conditions for allowing this flight-as-evidence-of-guilt principle as established in *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), an exegesis that is now accepted by most federal courts. *See 2 Weinstein's Federal Evidence* § 401.08[4], n. 21 (1997); *but see Miller v. United States*, 320 F.2d 767, 771 (D.C.Cir.1963) (opinion of Bazelon, J.) (questioning validity of common assumptions underlying flight evidence). Under *Myers* and *Cooke*, evidence of flight is admissible only if that evidence is capable of supporting each of four related inferences: (1) that the defendant's behavior constitutes flight, (2) that the flight indicates a general consciousness of guilt, (3) that consciousness of guilt is attributable to the specific crime alleged, and (4) that consciousness of guilt concerning the crime charged implies actual guilt of the crime charged. *Myers*, 550 F.2d at 1049; *Cooke*, 479 A.2d at 732–33. We also noted in *Cooke* that the defendant's knowledge of the reason for his flight is the linchpin for admitting such evidence. 479 A.2d at 733. Accordingly, "[w]hen the time between a defendant's flight and the crime is virtually immediate * * * the probative value of the flight is much greater than if the flight occurs several weeks or months later." *Id.; see also 2 Weinstein's* § 401.08[4] at 36, 37.

Here Reyes' conduct on the day of the Frias shooting alone satisfies the four-pronged *Cooke* analysis. First, in beating a hasty retreat from the place where he had so lately hovered over the slain Frias, Reyes "started like a guilty thing [u]pon a fearful summons."[5] Second, his bizarre behavior after he arrived at the Esteva residence created a bete noire scene that all but betrayed him as a felon on the lam, one who was not only trying to evade the long arm of the law but who was also painfully conscious of his murderous guilt. Given all this evidence—his leaving the murder scene immediately after Reyes' shooting, his apprehension of pursuit, his extreme nervousness (so severe that Reyes left the contents of his stomach in his friend's bathtub), his doffing of his old duds before donning the new attire he had beseeched from his hostess, his solicitation of a ride away from Esteva's home in an automobile, and his offering to pay for the gas before opting to take off on his own—a reasonable jury could justifiably conclude that he was acting in this manner because he was extremely upset and agitated after having just done something that he knew to be terribly wrong and because he was looking to further his flight from the scene of his wrongdoing.[6]

---

5. William Shakespeare, *Hamlet*, act I, scene i.

6. Arguing to a jury on behalf of the prosecution in the murder case of *Commonwealth v. Knapp*, 7 American State Trials 395 (1830), the great American orator, Daniel Webster, elevated the significance of a murderer's flight from the crime scene and his imagined "consciousness of guilt" to such a rarefied rhetorical height that it has doubtless never been scaled before or since:

"The fatal blow is given! * * * The deed is done! [The murderer] retreats, retraces his steps * * * and escapes. He has done the murder. No eye has seen him, no ear has heard him. The secret is his own, and it is safe!

"Ah! gentlemen, that was a dreadful mistake. Such a secret can be safe *nowhere*. The whole creation of God has neither nook nor corner where the guilty can bestow it, and say 'It is safe.' * * * Especially, in a case exciting so much attention as this, discovery must come, and will come, sooner or later. A thousand eyes turn at once to explore every man, every thing, every circumstance, connected with the time and place; a thousand ears catch every whisper; a thousand excited minds intensely dwell on the scene, shedding all their light, and ready to kindle the slightest circumstance into a blaze of discovery.

"Meantime the guilty soul cannot keep its secret. It is false to itself; or rather it feels an irresistible impulse of conscience to be true to itself. It labors under its guilty possession, and knows not what to do with it. The human heart was not made for the residence of such an inhabitant. It finds itself preyed on by a torment, which it dares not acknowledge to God or man. A vulture is devouring it, and it can ask no sympathy or assistance, either from heaven or earth. The secret which the murderer possesses soon comes to possess him; and, like the evil spirits of which we read, it overcomes him, and leads him withersoever it will. He feels it beating at his heart, rising to his throat, and demanding disclosure. He thinks the whole world sees it in his face, reads it in his eyes, and almost hears its workings in the very silence of his thoughts. It has become his master. It betrays his discretion, it breaks down his courage, it conquers his prudence. When suspicions from without begin to embarrass him, and the net of circumstances to entangle him, the fatal secret struggles with still greater violence to burst forth. It *must* be confessed! It WILL be confessed! There is no

██ These events, all of which immediately followed the Frias shooting, were manifestly sufficient to support an instruction to the jury on the significance of the defendant's flight. Thus the unobjected-to evidence of Reyes' subsequent apprehension in Massachusetts some five months later—while he was using a false name—was mere frosting on the prosecution's multilayered cake of flight evidence.

refuge from confession, but suicide,—and sui-

## Conclusion

For these reasons the defendant's appeal is denied, and the judgment of conviction is affirmed.