812 A.2d 1050

**Garrison THOMAS**

**v.**

**STATE of Maryland.**

**No. 33, Sept. Term, 2002.**

Court of Appeals of Maryland.

Dec. 18, 2002.

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued Before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

Garrison Thomas, petitioner, was convicted in the Circuit Court for Charles County of felony murder, robbery, and second-degree murder. In this appeal, he raises two questions for review. The primary question is whether the trial court erred in admitting as evidence of consciousness of guilt the fact that petitioner resisted when, pursuant to a search warrant, the police sought to obtain a sample of his blood. The second question is whether the trial court's rulings restricting the cross-examination of a key State's witness and

limiting access to that witness' psychiatric records violated petitioner's right to confrontation. We shall hold that the evidence of petitioner's refusal to provide a blood sample was inadmissible to show consciousness of guilt. Accordingly, we shall reverse.

## I.

Petitioner was convicted of killing Beverly Renee Mitchell. A passerby discovered Ms. Mitchell's body in Charles County on the evening of March 23, 1995. Police collected physical evidence surrounding her body, including her ATM card and a bank receipt for a withdrawal of $60.00 dated March 22, 1995. The medical examiner ruled her death a homicide, caused by strangulation and blunt force injuries to the head.

Marva Mitchell, the victim's mother, last saw her daughter on the evening of March 22, 1995. She had asked her daughter to bring some money to her sister's husband, James Porter. Marva Mitchell had stopped at the Porter residence earlier that day to tell Mr. Porter that Beverly Mitchell would be bringing the money he needed to get to work the next day. Petitioner, who lived in the basement of the Porters' home, was present during that conversation. Beverly Mitchell visited her mother that evening around 9:00 p.m.; when she left, she said that she was going to the Porters' home. Porter testified that Ms. Mitchell dropped off $10.00 at his house that evening.

On the morning of March 24, 1995, the police located Ms. Mitchell's car in the 1100 block of 10th Street, Southeast, in Washington, D.C. On that same day, police located witness Novella Lee Harris. Harris directed investigators to the victim's car keys and told the police information that linked petitioner to the car. Harris recounted that at approximately 2:30 a.m. on March 23, 1995, petitioner knocked on her door. He was wearing a dark brown wig and women's clothing and identified himself as "Cookie." He was seeking narcotics. Petitioner was driving a car later identified as the car belonging to the victim.

Harris, petitioner, and another man smoked crack together for much of the following day. Petitioner, appearing nervous about the car, told Harris differing stories about how he got the car, wiped the car down to remove his fingerprints, and moved the car to the location where police discovered it. Harris saw petitioner discard the car keys in two different locations and saw him attempt to set fire to the car. Petitioner finally left Harris' home around 8:00 a.m. on March 24, 1995.

On June 25, 1998, approximately three and one quarter years after the murder, with the investigation at a standstill, the police decided to approach petitioner to collect hair and blood samples. Because petitioner was then living in the District of Columbia, police sought and secured a search warrant, issued by the District of Columbia, for blood and hair samples from petitioner.[1] The police met petitioner at his residence and took him to a police station in the District of Columbia. At the station, police showed him the warrant and gave him an opportunity to read it. Detectives explained that because of the search warrant, petitioner was required to give police hair and blood samples. Petitioner resisted, stating, "You ain't getting it." He was restrained forcibly on the ground, and a nurse from a local hospital drew a blood sample. Petitioner calmed down after the blood was drawn and cooperated with the officers in providing hair samples. He also cooperated with police in giving a second blood sample. The laboratory examination of the blood sample excluded petitioner as a source of the blood found at the crime scene.

Petitioner's trial commenced in June 1999 in the Circuit Court for Charles County. Novella Lee Harris was a key witness against petitioner. Petitioner filed two Motions for

---

1. The validity of that warrant is not at issue in this appeal. In *Schmerber v. California*, 384 U.S. 757, 768, 770–71, 86 S.Ct. 1826, 1834, 1835–36, 16 L.Ed.2d 908 (1966), the United States Supreme Court clarified that the seizure of blood with a warrant may be reasonable under the Fourth Amendment and held that, under the circumstances presented, a warrantless seizure of blood was reasonable.

Subpoena for Tangible Evidence and In Camera Review to obtain pre-trial discovery of Harris' psychiatric records from Crownsville State Hospital, located in Crownsville, Maryland, and St. Elizabeth's Hospital, located in the District of Columbia. Petitioner requested an in camera review of the records from Crownsville State Hospital to determine whether the records contained relevant information regarding any psychiatric disorders that could provide background for cross-examination. He also asked the court to subpoena records from St. Elizabeth's Hospital in order to conduct a similar review.

After the Circuit Court conducted an in camera review of the Crownsville Hospital records, the court focused on a thirty-day commitment for a mental evaluation of Harris that occurred in May and June of 1982. The court ruled that the records were not relevant to any issue before the court. The judge denied petitioner's motion to subpoena privileged records for pre-trial review from St. Elizabeth's Hospital on the following two grounds: petitioner did not show any likelihood that the records contained any relevant information, and St. Elizabeth's Hospital is not an agency under Maryland control.

At trial, during the cross-examination of Harris, petitioner asked about her "history of emotional problems." In response to the State's objection, petitioner argued that he wanted to explore Harris' "weird feelings" and whether they resulted from smoking crack or emotional problems. The court sustained the objection but permitted some latitude to defense counsel, ruling as follows:

"You can ask her what was causing her weird feelings. I have no problem with that. And if you want to ask her anything further about emotional problems then you can approach the bench because I don't know where we are going to go and I don't believe that you do either."

Defense counsel never questioned Harris further about her feelings or psychiatric history.

Petitioner moved in limine to preclude the State from introducing testimony that petitioner resisted when the police officers sought to draw a sample of his blood. The State

argued that the refusal to give the blood sample was admissible as evidence to show consciousness of guilt. Petitioner argued that the evidence was not relevant because the police attempted to take the blood sample over three years after the murder and because many innocent reasons other than consciousness of guilt could explain a person resisting police attempts to procure a blood sample. Petitioner maintained that the evidence of his refusal was ambiguous and therefore irrelevant. He argued that even if the evidence were relevant, its prejudicial effect outweighed its probative value. The trial court denied petitioner's motion, and the State offered the evidence at trial.[2] Petitioner was convicted, and the judge sentenced him to life imprisonment for felony murder and merged the other convictions for sentencing purposes.

Petitioner noted a timely appeal to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed, holding that the trial court did not abuse its discretion in admitting the evidence of Thomas' refusal to provide a blood sample as evidence of consciousness of guilt. The court also held that the trial judge did not abuse his discretion by excluding Harris' psychiatric records as irrelevant and by limiting cross-examination regarding her alleged emotional problems.

We granted Thomas' petition for writ of certiorari to answer the following questions:

---

2. At the conclusion of all of the evidence, the trial court, using Maryland Criminal Pattern Jury Instruction (MPJI Cr) 3:26, instructed the jury on concealment of evidence as consciousness of guilt:
> "[C]oncealment or destruction of evidence as consciousness of guilt. This is another one of those inferences that you're permitted but don't have to draw. You have heard evidence from which you could find that the defendant may have concealed or destroyed or may have attempted to conceal or destroy evidence in this case. Concealment or destruction of evidence is not enough by itself to establish guilt but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether the defendant has concealed or destroyed or attempted to conceal or destroy evidence in the case. If you find that he has, then you must decide whether that conduct shows a consciousness of guilt."

"Whether testimony that the accused resisted attempts to draw his blood is admissible as evidence of 'consciousness of guilt.'

"Whether the accused's right to confrontation includes pre-trial disclosure of the State's key, non-victim witness' psychiatric history, as well as cross-examination of that witness regarding her psychiatric history."

*Thomas v. State,* 369 Md. 570, 801 A.2d 1031 (2002). We hold that the trial court erred in admitting the testimony regarding petitioner's refusal to submit to blood testing to show consciousness of guilt.

## II.

Petitioner's first argument is that the trial court erred in denying his motion in limine to exclude testimony regarding his refusal to submit to a blood test. He contends that the evidence is irrelevant because it is ambiguous in that the demand for the blood occurred more than three years after the murder and that his conduct was susceptible to many possible innocent explanations. Even if probative, any probative value it might have is substantially outweighed by the danger of prejudice.

The State argues that petitioner's resistance, after he was informed of his legal obligation to comply, was relevant to show a consciousness of guilt. The State contends that any possible innocent explanation for the conduct goes to the weight of the evidence but not its admissibility. The State argues that petitioner's refusal to submit to blood testing, unaccompanied by any indications of religious or other concerns, shows his fear that the test results might produce inculpatory evidence linking him to Ms. Mitchell's murder. The State concludes that the trial court properly exercised its discretion in admitting the evidence to show consciousness of guilt.

Petitioner's second issue relates to his ability to cross-examine Ms. Harris. He argues that the trial court erred in denying his Motions for Subpoena for Tangible Evidence and

In Camera Review. He argues that the trial court should have subpoenaed records from St. Elizabeth's Hospital even though the hospital is not a Maryland agency. Petitioner also contends that although the trial court briefly reviewed the Crownsville Hospital records in camera, due process required that the court conduct a thorough review for information relevant to Harris' mental state. Denial of pre-trial access to the psychiatric records, he argues, undermined his ability to prepare a proper cross-examination. Finally, petitioner asserts that, in contravention of the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, the trial court deprived him of a fair trial by limiting his cross-examination of Harris about her psychiatric history.

The State argues that the trial court properly denied petitioner's motions as to Harris' Crownsville psychiatric records. In addition, the State argues that because petitioner actually had the Crownsville records pre-trial, the scope of the court's in camera review made little or no difference. Moreover, petitioner could not identify anything relevant in those records. As to the St. Elizabeth's Hospital records, the State contends that because the Hospital is an out-of-state agency and the defense could not show any likelihood that the records contained relevant information, the trial court did not err. Finally, as to the scope of Harris' cross-examination, the trial court did not abuse its discretion.

### III.

The fundamental test in assessing admissibility is relevance. Maryland Rule 5–402 provides as follows:

"Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible."

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence." Md. Rule 5–401; *see also Snyder v. State,* 361 Md. 580, 591, 592, 762 A.2d 125, 131 (2000)(noting that evidence is relevant when "in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable"). Relevant evidence is generally admissible. *See* Md. Rule 5–402. A trial court, however, may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Md. Rule 5–403.

A person's behavior after the commission of a crime may be admissible as circumstantial evidence from which guilt may be inferred. This category of circumstantial evidence is referred to as "consciousness of guilt." We observed in *Snyder v. State,* 361 Md. 580, 591, 762 A.2d 125, 131 (2000) that "[i]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5–403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt." 361 Md. at 593, 762 A.2d at 132; *see also Martin v. State,* 364 Md. 692, 706, 775 A.2d 385, 393 (2001); *Whittlesey v. State,* 340 Md. 30, 62 65, 665 A.2d 223, 239–40 (1995); *Hunt v. State,* 312 Md. 494, 508–09, 540 A.2d 1125, 1132 (1988); *Wright v. State,* 312 Md. 648, 654–55, 541 A.2d 988, 991 (1988); *Davis v. State,* 237 Md. 97, 105–06, 205 A.2d 254, 259 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965); *Westcoat v. State,* 231 Md. 364, 368, 190 A.2d 544, 546 (1963). Conduct typically argued to show consciousness of guilt includes flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence. *See, e.g., Whittlesey,* 340 Md. at 63–65, 665 A.2d at 239–40 (flight); *Sorrell v. State,* 315 Md. 224, 230–31, 554 A.2d 352, 355 (1989)(failure to return during trial); *Wright,* 312 Md. at 654–57, 541 A.2d at 991–92 (use of false name to conceal identity); *Sewell v. State,* 34 Md.App. 691, 694–95, 368 A.2d 1111, 1114 (1977)(destruction of evidence); 2 *McCormick on Evidence* § 263, at 172–73 (John W. Strong ed., 5th ed.1999)(flight from scene or from jurisdiction after crime, assuming false name, changing appearance, resisting arrest, attempting to bribe arresting officers, forfeiture of

bond by failure to appear, escape from confinement); 2 J. Wigmore, *Evidence* § 276, at 111 (3d ed.1940)(flight, escape from custody, resistance to arrest, concealment of evidence, assumption of false name).

■ A person's post-crime behavior often is considered relevant to the question of guilt because the particular behavior provides clues to the person's state of mind. The reason why a person's post-crime state of mind may be relevant is because, as Professor Wigmore suggested, the commission of a crime can be expected to leave some mental traces on the criminal. 1 Wigmore, *supra*, § 173, at 632.

■ Applying our accepted test of relevancy, "guilty behaviour should be admissible to prove guilt if we can say that the fact that the accused behaved in a particular way renders more probable the fact of their guilt." Andrew Palmer, *Guilt and the Consciousness of Guilt: The Use of Lies, Flight and Other 'Guilty Behaviour' in the Investigation and Prosecution of Crime*, 21 Melb. U.L.Rev. 95, 98 (1997). As is the nature of circumstantial evidence, the probative value of "guilty behavior" depends upon the degree of confidence with which certain inferences may be drawn. Professor Wigmore has identified two distinct inferences—first, an inference of a guilty state of mind from the guilty behavior; and second, an inference of guilt from the guilty state of mind. *See* 1 Wigmore, *supra*, § 173, at 632. Some courts have identified four inferences that are necessary to establish admissibility. In the context of flight as consciousness of guilt evidence, the United States Court of Appeals for the Fifth Circuit reasoned that the probative value of the evidence

"depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

*United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977); *see also, e.g., United States v. King*, 200 F.3d 1207, 1215 (9th Cir.1999); *United States v. Hankins*, 931 F.2d 1256, 1261–62 (8th Cir.1991); *United States v. Dillon*, 870 F.2d 1125, 1126–27 (6th Cir.1989); *United States v. Howze*, 668 F.2d 322, 324 (7th Cir.1982); *Ex parte Weaver*, 678 So.2d 284, 290 (Ala. 1996); *State v. Reyes*, 705 A.2d 1375, 1377 (R.I.1998). While refusal to give a blood sample is not the same as flight, it is analogous conduct and a similar analysis is required. 1 J. Weinstein & M. Berger, *Weinstein's Evidence* § 401[10], at 72–75 (1993); *cf. Wright*, 312 Md. at 655, 541 A.2d at 991–91 (noting that in the context of consciousness of guilt, while assumption of an alias is not the same as flight, it is analogous conduct).

In *Snyder v. State*, this Court identified four inferences that must be satisfied before the evidence that Snyder failed to inquire about the progress of the police investigation into his wife's murder was admissible to show consciousness of guilt. 361 Md. at 596, 762 A.2d at 134. We discussed the reasoning process undergirding the relevancy of consciousness of guilt evidence:

> "The relevance of the petitioner's failure to inquire depends upon whether that evidence supports four inferences: [1] from the failure to inquire, satisfaction of the case not being solved or actively pursued; [2] from the satisfaction of the case not being solved or actively pursued, a consciousness of guilt; [3] from a consciousness of guilt, a consciousness of guilt of murder; and [4] from a consciousness of guilt of murder, actual guilt of murder."

*Id.* at 596, 762 A.2d at 134.

Although evidence of consciousness of guilt has long been allowed as evidence in the courts of this State and universally is admitted in courts around the country, courts have nonetheless recognized the danger with respect to this category of evidence and increasingly have become cautious in evaluating it. *See, e.g., Myers*, 550 F.2d at 1049–50; *Miller v. United States*, 320 F.2d 767, 770–73 (D.C.Cir.1963); *Ex parte Weaver*,

678 So.2d at 287–91; *State v. Lee*, 381 So.2d 792, 794–95 (La.1980); 2 *McCormick, supra,* § 263, at 173–74. Several cases seem to recognize such evidence as potentially unreliable and unfairly prejudicial. *See, e.g., Howze,* 668 F.2d at 324–25; *Myers,* 550 F.2d at 1049–50; *Miller,* 320 F.2d at 770–73; *Lee,* 381 So.2d at 794–95; *State v. Onorato,* 171 Vt. 577, 762 A.2d 858, 859–60 (2000); 2 *McCormick, supra,* § 263, at 174. In *Wong Sun v. United States,* 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963), the United States Supreme Court noted: "[W]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."

▇ It is the *Myers* third prong, from consciousness of guilt to consciousness of guilt concerning the crime charged, that in the instant case is particularly important.[3] Knowledge that the person is suspected of the charged crime is important because the value of the conduct lies in the culprit's knowledge that he or she has committed the charged offense and in his or her fear of apprehension. In the context of flight, one court noted:

"From this analysis of the reasons for the admissibility of such evidence, the force of the rule that evidence of flight because of one crime cannot be considered on the trial of another and entirely different offense is apparent, as in such case the flight does not disclose any guilty conscience in regard to the offense in question."

*Ex parte Jones,* 541 So.2d 1052, 1056 (Ala.1989)(quoting *State v. Bonning,* 60 Mont. 362, 199 P. 274, 275 (1921), *overruled on other grounds State v. Campbell,* 146 Mont. 251, 405 P.2d 978 (1965)). Thus, many courts emphasize the importance of connecting a defendant's consciousness of guilt to a conscious-

---

3. We do not suggest that merely because the evidence may show that a defendant also has committed other crimes there is a basis to exclude the evidence. The point is that the evidence must at least be connected to the crime charged. McCormick suggests that older cases simply overlooked this problem. *See* 2 *McCormick on Evidence* § 263, at 173 n. 19 (John W. Strong ed., 5th ed.1999).

ness of guilt for the specific crime alleged. *See, e.g., Snyder,* 361 Md. at 596, 762 A.2d at 134; *United States v. Murphy,* 996 F.2d 94, 96–97 (5th Cir.), *cert. denied,* 510 U.S. 971, 114 S.Ct. 457, 126 L.Ed.2d 389 (1993); *United States v. Beahm,* 664 F.2d 414, 419–20 (4th Cir.1981); *Myers,* 550 F.2d at 1050; *Lee,* 381 So.2d at 794; *Reyes,* 705 A.2d at 1376–77; 2 *McCormick, supra,* § 263, at 174. There must be an evidentiary basis, either direct or circumstantial, to connect a defendant's consciousness of guilt to the particular crime charged in order to submit the evidence for jury consideration. *See Snyder,* 361 Md. at 596, 762 A.2d at 134; *Myers,* 550 F.2d at 1049–51; *Commonwealth v. Osborne,* 433 Pa. 297, 249 A.2d 330, 333 (1969).

On several occasions, this Court has held that a defendant's conduct was too ambiguous and equivocal to be admissible as evidence of consciousness of guilt. In *Snyder,* this Court noted that the evidence of the defendant's conduct, not inquiring as to the progress of the police investigation of his wife's murder, failed to satisfy the four inferences necessary in order to be relevant. 361 Md. at 596, 762 A.2d at 134. Concluding that the evidence was not probative of the defendant's guilt and hence was inadmissible, we reasoned:

> "We believe that, under the circumstances of this case, evidence that the defendant failed to call the police to inquire about the status of the investigation, even for seven years, is too ambiguous and equivocal to support such inferences. At best, the admission of the evidence invites the jury to speculate."

*Id.* at 596, 762 A.2d at 134.

Similarly, in *Bedford v. State,* 317 Md. 659, 668, 566 A.2d 111, 115 (1989), we held that the evidence offered by the State to show consciousness of guilt was so equivocal that it should have been excluded because it was more prejudicial than probative. In that case, we addressed evidence of an escape attempt. When Bedford was strip-searched in preparation for a visit off prison grounds, officers discovered inside his undergarments a four-inch piece of metal sharpened to a point. The

State argued that the wire supported an inference that Bedford planned to escape. We noted:

> "The authorities are uniform that evidence of a consciousness of guilt is generally circumstantial and should be more probative on the issue of ultimate guilt than prejudicial to the defendant. If the judge finds that the proposed material is likely to lead a reasonable jury to infer the defendant's guilt without causing him substantial prejudice, then the judge may allow the jury to consider the evidence in reaching a verdict as to the charged offense. If, however, the inference as to ultimate guilt is weak and the circumstantial evidence merely tends to create in the minds of jurors the impression that the defendant is of questionable character and has a propensity for bad acts ... then the evidence should be excluded."

*Id.* at 667–68, 566 A.2d at 115 (citations omitted). We reasoned that "[t]here are too many other possible reasons why Bedford could have been in possession of that wire" to make the wire probative of guilt and, instead, the evidence could cause the jury to make other, impermissible inferences about him. *Id.* at 668, 566 A.2d at 115.

■ The relevance of the evidence as circumstantial evidence of petitioner's guilt depends on whether the following four inferences can be drawn: (1) from his resistance to the blood test, a desire to conceal evidence; (2) from a desire to conceal evidence, a consciousness of guilt; (3) from a consciousness of guilt, a consciousness of guilt of the murder of Ms. Mitchell; and (4) from a consciousness of guilt of the murder of Ms. Mitchell, actual guilt of the murder. The question in this case is whether the evidence of petitioner's refusal to submit to the drawing of his blood was connected sufficiently with the murder charge and whether its probative value was outweighed by any unfair prejudicial effect. We conclude that the trial judge erred in admitting the evidence in this case.

There is no evidence in this record for the jury to have found that any alleged consciousness of guilt on petitioner's

part was connected to a consciousness of guilt of the murder of Ms. Mitchell. The record indicates that Ms. Mitchell was killed on March 22, 1995. The police did not seek to obtain a blood sample from petitioner until three and one quarter years later, on June 25, 1998.[4] When police decided to seek a search warrant for blood and hair samples from petitioner, the investigation had stalled, and they were hoping to "get lucky." Officer Knowlan testified at trial that police gave petitioner the search warrant to read and explained that legally he was obligated to have his blood taken. There is no evidence in this record, either direct or circumstantial, that petitioner was aware that the police wished to test his blood in connection with the murder investigation of Ms. Mitchell. The officer never testified as to what, if anything, police told petitioner as to the reason why they wanted his blood. Moreover, the State never entered the search warrant into evidence.[5] Therefore, there was absolutely no evidence from which the jury could conclude that petitioner knew that the blood sample was in any way connected to the Mitchell murder. For the evidence to have value as evidence of consciousness of guilt, and then as evidence of guilt of the murder, there must be evidence to support an inference from petitioner's conduct to a conscious-

---

4. The length of time between the conduct and the crime is not determinative of the admissibility of the evidence. We have noted that the "lapse of time between the crime and the attempted flight goes only to the weight to be accorded to this circumstance, not to the admissibility of the attempt as some evidence of consciousness of guilt." *Davis v. State*, 237 Md. 97, 105, 205 A.2d 254, 259 (1964), *cert. denied*, 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965). Each case must decided on its own facts and circumstances. A circumstance may be so remote, however, as to be of no real value and thus inadmissible. The more remote in time the alleged conduct is from the time the person is aware that he or she is the focus of the investigation for the crime, however, the greater the likelihood that the conduct in question resulted from something other than feelings of guilt concerning the offense charged.

5. It is unclear from the officer's testimony whether the search warrant that petitioner was given to read included the supporting affidavit, nor is there any evidence as to whether petitioner read the warrant or whether the police read it to him. The officer could have testified that petitioner was advised that the evidence sought was in connection with the Mitchell murder.

ness of guilt for the particular crime charged. The jury should not have been permitted to draw an inference of guilt from petitioner's conduct unless the conduct was related to the murder investigation. Because there is no evidence connecting petitioner's refusal to allow the officers to draw his blood and a consciousness of guilt of the murder of Ms. Mitchell, the evidence of defendant's conduct lacks probative value and was inadmissible.

## IV.

Although we reverse on the first question, we will address the remaining issue for the guidance of the trial court on remand. Petitioner argues that the trial court erred in denying his motions seeking pre-trial discovery of Harris' psychiatric records from two area hospitals. He also contends the trial court deprived him of a fair trial by precluding cross-examination of Harris about her alleged history of emotional problems. The State, in response, argues that the trial court properly denied petitioner's motions as to Harris' psychiatric records mainly because petitioner failed to proffer that there was any likelihood that they held relevant information. The State also asserts that the trial court properly exercised its discretion in controlling the scope of Harris' cross-examination.

The Court of Special Appeals, in an unreported opinion, affirmed the trial court's judgments, finding no abuse of discretion. In terms of the Crownsville records, the intermediate appellate court noted:

"In *Goldsmith v. State*, 337 Md. 112, 651 A.2d 866 (1995), the Court of Appeals held that the victim's psychiatric records were privileged and not discoverable. *Id.* at 127–28, 651 A.2d 866. It went on to say that even if not privileged, the records sought by the defendant were not discoverable because the defendant failed to show a likelihood that the records contained relevant information. *Id.* .... [Thomas] did not proffer how the Crownsville records were relevant in any way. We are satisfied that [the trial judge] did not

abuse his discretion in declaring irrelevant records relating to an admission that occurred 13 years prior to the incident at issue."

With respect to the St. Elizabeth records, the court also agreed with the trial court, reasoning:

"As was the situation in *Goldsmith,* the St. Elizabeth records are privileged and therefore not discoverable in the instant case. Moreover, [Thomas] failed to show a likelihood that the records contained any relevant information. Additionally, St. Elizabeth's Hospital is not a state agency and the records do not fall with the ambits of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)(holding that exculpatory information in the hands of the State is subject to disclosure). Thus, [the trial judge] did not abuse his discretion when he ruled that the records would not be subpoenaed."

Finally, the Court of Special Appeals upheld the trial court's treatment of Harris' cross-examination as follows:

"In the case at bar, [the trial judge] asked [Thomas'] counsel what evidence he had demonstrating any emotional problems that would affect Harris' memory. [Thomas'] counsel pointed to the witness' statement regarding weird feelings. [The trial judge] allowed [Thomas] to ask the witness about weird feelings, but counsel declined to ask. To be relevant, Harris' mental history had to be of consequence to her ability to perceive events on the night in question. Without some additional foundation, the proposed cross-examination would not have linked the witness's prior emotional problems with her ability to remember the events relating to the murder. Thus, [the trial judge] did not abuse his discretion when he refused to allow [Thomas] to cross examine Harris about her mental problems."

We find the reasoning of the Court of Special Appeals persuasive and agree that the trial court properly exercised its discretion in its rulings as to Harris' psychiatric records and psychiatric history on cross-examination.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CHARLES COUNTY.*

BELL, Chief Judge, concurs in the result and in the opinion except Part IV.