**STATE**

v.

**John LOMBA.**

No. 2010–96–C.A.

Supreme Court of Rhode Island.

Feb. 13, 2012.

616

Virginia M. McGinn, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

A gray Chrysler Pacifica stands at the center of an encounter between the defendant, John Lomba, and Joseph and Susan Rocheleau, the son and daughter-in-law of his friend, Leonard Rocheleau.[1] The circumstances of this case constitute but one chapter in what appears to have been an ongoing feud between the defendant and Joseph and Susan. The increasing enmity between the parties escalated into a brawl that occurred on July 11, 2008, after the defendant discovered Joseph and Susan tampering with the license plate affixed to the Pacifica while the vehicle was parked in the dirt parking lot of the Little Rhody Beagle Club in Warwick, Rhode Island. During the melee that ensued, the defendant struck Susan in the shoulder, and slashed Joseph's arm with a utility knife.

The state charged defendant with three counts of assault with a dangerous weapon and one count of simple assault. After a jury trial in the Kent County Superior Court, he was acquitted of the three felony counts, but convicted of simple assault. The trial justice sentenced defendant to one year at the Adult Correctional Institutions, with ninety-days to serve and nine months suspended, with probation. In addition, the trial justice issued no-contact orders with respect to both Joseph and Susan Rocheleau and Leonard Rocheleau. The defendant's timely appeal followed. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts & Travel

Leonard Rocheleau, a seventy-two-year-old widower, lived at Sparrow's Point, a Warwick housing development for senior citizens and some disabled persons. John Lomba, then forty-seven years old, also lived at Sparrow's Point. The defendant and Leonard became friends; they would talk often and visit each other's apartments. Leonard's son Joseph and his daughter-in-law Susan, who regularly visited Leonard, met John for the first time when Leonard brought him to church. Joseph and Susan testified that they became somewhat estranged from Leonard in February 2008. That estrangement, which apparently was tied to Leonard's relationship with defendant, lasted until June 2008, when Leonard reached out to Joseph and Susan. During that time, the Superior Court issued mutual restraining orders against defendant and Joseph and Susan Rocheleau, without a finding of liability against any party.

On July 11, 2008, the simmering tensions between the parties burst into a conflagration. Susan and Joseph testified that around 5:30 p.m. that day, they were on their way to a family dinner at Applebee's restaurant in Warwick when they spotted defendant in the parking lot of the same plaza where the restaurant is located. They observed him standing outside of a gray Chrysler Pacifica, which Susan and Joseph recognized as Leonard's vehicle. They believed that the Pacifica was unregistered, prompting them to call the police. Susan testified that she told the police that the Pacifica "was an unregistered vehicle, that it was [her] father-in-law's vehicle and [that] he did not have a

---

1. Because Susan, Joseph, and Leonard all share the same surname, we will refer to all of the Rocheleaus by their given names in our discussion of the facts to avoid confusion. No disrespect is intended.

license to drive it."[2]   Susan and Joseph waited about thirty minutes, but left when the police did not respond.

After dinner, Susan and Joseph testified that they drove to the nearby Little Rhody Beagle Club because Leonard had told them that "John was hiding the car at the Beagle Club because it was unregistered and that Sparrow's Point would have the car towed off the property." The Beagle Club has a long driveway that ends in a dirt parking lot adjacent to the Sparrow's Point community. While on the Beagle Club property, Susan and Joseph spoke to Carl Swanson, a member of the club. Joseph told Swanson that he was looking for a "stolen car," and that the police "had been looking for two months and they hadn't come up with anything, so we're taking this thing on our own." At trial, Swanson testified that Joseph and Susan were "kind of aggressive," and that he told them that they were on private property, that they did not belong there, and that they had to leave. As they started toward the exit, Susan and Joseph saw defendant driving the Pacifica in the driveway. There was a heated exchange, during which Susan told defendant, "Good luck parking, because they're aware that you're parking up there." John responded by saying that he had permission to park at the club.[3]

Sometime after 10 p.m., Joseph and Susan returned to the Beagle Club to see whether defendant had left the Pacifica in its parking lot. They spotted the car at the end of the driveway, and Joseph pulled their vehicle alongside it. Susan tried to look into the Pacifica's windows, but could not see anything inside the vehicle. What they could see, however, was the Pacifica's license plate; they believed that it was actually a plate that had been assigned to a demolished Ford Taurus previously owned by Leonard. Susan testified that they decided to try to pry the plate from the car because they feared Leonard might be held responsible if the Pacifica was involved in an accident.

As Joseph struggled with the license plate, defendant appeared out of the darkness, coming around some nearby bushes. He began to shout and curse, telling Susan and Joseph to get away from his car. Both Susan and Joseph testified that as defendant approached, they could see he was holding something in his hand, but they could not see what it was. Joseph testified that defendant tried to kick him out of his way, but failed to make contact. Susan testified that defendant then came toward her, and that when she told him she was calling the police, he "went after [her] with his object," punched her in her left-upper chest, and pushed her out of the way in an effort to reach the car door. A violent affray ensued, during which Joseph ended up on top of defendant inside the car. As the pair wrestled, Joseph was cut on the arm with a utility knife.[4]   After about a minute, Joseph extracted himself

2.   The defendant was not charged with any motor vehicle offense, and the jury was so instructed by the trial justice at the time of this testimony.

3.   Swanson testified that when he saw defendant that evening, he asked him why he was there, and that defendant showed him a note. Swanson was not permitted to communicate the contents of the note, but testified that he took no further action after reading it.

4.   There was a significant amount of conflicting testimony with respect to exactly what was in defendant's hand as he approached Joseph and Susan. In a written statement, defendant told police officers that he picked up the utility knife from the passenger-side floor as he and Joseph fought inside the car.

from the car, shut the door, and retreated.[5] Joseph testified that defendant then put the car in reverse and sped toward him, causing him to jump out of the way to avoid being struck. In his haste, however, defendant failed to turn on the Pacifica's headlights and he collided with a dump truck that was parked along the edge of the driveway.

Sergeant Andrew Tainsh of the Warwick Police Department was the first officer to respond to the scene. He testified that as soon as he arrived he saw defendant running from the driveway into the woods. Sergeant Tainsh followed him and ordered him to stop. Initially, defendant responded by crouching behind a small berm; he emerged only after Sgt. Tainsh again ordered him to reveal himself. The defendant identified himself and said that he had stabbed someone in a fight over a car. After defendant was placed under arrest, officers discovered a flashlight, an owner's manual for a Chrysler, a utility knife with the blade exposed, a license plate, and a set of keys behind the berm.

## II

### Arguments of the Appellant

Before this Court, defendant advances two arguments. First, he contends that the trial justice erred when he denied his motion for judgment of acquittal on the charge of simple assault because the state failed to introduce evidence of malice or wantonness. Second, defendant argues that the cumulative effect of the trial justice's evidentiary rulings deprived him of his constitutional right to present a full and fair defense. He contends that the trial justice erred by improperly limiting his attempts to delve into the relationship between the parties and by ruling that his out-of-court statement to a police officer about being the victim of a hate crime in 1998 was inadmissible hearsay.

## III

### Standard of Review

"In reviewing a denial of a motion for judgment of acquittal, we apply the same standard as applied by the trial justice." *State v. Brown,* 9 A.3d 1232, 1237 (R.I.2010) (citing *State v. Caba,* 887 A.2d 370, 372 (R.I.2005)). Accordingly, "we 'view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses and draw all reasonable inferences that are consistent with guilt.'" *Id.* (quoting *State v. Henshaw,* 557 A.2d 1204, 1206 (R.I.1989)). "If, after viewing all of the evidence, 'the inferences drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied.'" *Id.* (quoting *State v. Hornoff,* 760 A.2d 927, 932 (R.I.2000)). With respect to the trial justice's evidentiary rulings, "[t]his Court consistently has held that determining the admissibility of evidence is squarely within the purview of the trial justice." *State v. Johnson,* 13 A.3d 1064, 1065–66 (R.I.2011); *see also State v. McManus,* 990 A.2d 1229, 1234 (R.I.2010). "We will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion." *Johnson,* 13 A.3d at 1066 (citing *Mc-Manus,* 990 A.2d at 1234; *State v. Reyes,* 984 A.2d 606, 614–15 (R.I.2009); *Ferrell v. Wall,* 889 A.2d 177, 188 (R.I.2005)).

---

**5.** Joseph did not immediately realize that he had been injured. He suffered various cuts and bruises on his face, as well as a wound on his arm that required sixteen to eighteen stitches to close.

## IV

## Analysis

### A. Motion for Judgment of Acquittal

The defendant asserts that his "offer of force did not constitute an assault since it was not made with a wicked or malicious intention to cause injury to Mrs. Rocheleau * * *." Rather, he reasons that any blow that he may have directed at Susan Rocheleau was lawful because "she deliberately tried to block [him] from getting into his car after he emphatically warned her and her husband to get away from the vehicle." In other words, he argues that because his actions were undertaken "in order to be able to do what he had every right to do," the state failed to demonstrate in its case-in-chief that he possessed the necessary *mens rea* for simple assault. However, after considering, as we must, all the evidence in the light most favorable to the state, it is our firm opinion that there were ample facts from which a reasonable juror could conclude beyond a reasonable doubt that defendant acted with malice or wantonness.

We have defined simple assault as an "unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness." *State v. Pope*, 414 A.2d 781, 788 (R.I.1980) (quoting *State v. Baker*, 20 R.I. 275, 277, 38 A. 653, 654 (1897)). In addition, we have held that simple assault is a general intent crime. *See In re Michael*, 423 A.2d 1180, 1183 (R.I.1981). In its most plain and ordinary sense, malice means "wrongful intention." *See* Black's Law Dictionary 1042 (9th ed.2009) (quoting John Salmond, *Jurisprudence* 384 (10th Glanville L. Williams ed., 1947)). The primary legal definition is "[t]he intent, without justification or

excuse, to commit a wrongful act." *Id.* In addition, legal malice is defined simply as "ill will" or "wickedness of the heart." *Id.* We are convinced that this definition is appropriate in the context of simple assault. This conclusion is consistent with this Court's construction of the term "maliciously" more than one hundred years ago in the context of malicious destruction. *See State v. Gilligan*, 23 R.I. 400, 408, 50 A. 844, 847 (1901) (defining malicious as "[t]he doing [*sic*] a wrongful act intentionally without just cause or excuse; a wicked and mischievous purpose which characterizes the perpetration of an injurious act without lawful excuse.").

As the learned trial justice ruled, whether defendant acted with malice was a question of fact to be determined by the jury. *See, e.g., State v. Blood*, 70 R.I. 85, 108–09, 37 A.2d 452, 463 (1944). At trial, Susan and Joseph Rocheleau testified that it was defendant who approached them, coming out of the darkness from the bushes that surrounded the parking lot. Each testified that defendant was screaming obscenities, and that he escalated what began as a verbal argument into a physical encounter by trying to kick Joseph. There is no dispute that defendant then pushed or punched Susan. Furthermore, Sgt. Tainsh testified that defendant attempted to hide from police by ducking behind a dirt berm in the woods, which certainly may be interpreted as consciousness of guilt.[6] In our opinion, after considering this evidence in the light most favorable to the state, a reasonable juror could conclude beyond a reasonable doubt that defendant acted with "wrong intention" or "ill will" when he struck Susan Rocheleau. Therefore, the trial justice did not err in

---

**6.** It is axiomatic that evidence of a defendant's flight is admissible to show "consciousness of guilt." *See, e.g., State v. Reyes*, 705 A.2d 1375, 1376–77 (R.I.1998) (citing *State v. Cooke*, 479 A.2d 727, 732–33 (R.I.1984)).

denying defendant's Super. R.Crim. P. 29 motion for judgment of acquittal.

## B. Evidentiary Rulings

▮▮▮ The defendant next contends that "the trial justice denied [him] his constitutional right to present a full and fair defense not only by improperly precluding evidence critical to his claim of self-defense, but also by unfairly limiting his cross-examination of both complaining witnesses." It is well established that evidentiary rulings are addressed to the sound discretion of the trial justice. *See, e.g., Johnson,* 13 A.3d at 1065–66; *McManus,* 990 A.2d at 1234. Nonetheless, we have held that the trial justice's "discretion must be exercised in a manner consistent with the constitutional guarantees involved." *State v. Patriarca,* 112 R.I. 14, 37, 308 A.2d 300, 315 (1973) (citing *State v. Rossi,* 71 R.I. 284, 43 A.2d 323 (1945)). "Due process requires that every defendant have a full opportunity to establish the best and fullest defense available to him." *Id.* at 37–38, 308 A.2d at 315; *see also State v. Scurry,* 636 A.2d 719, 725 (R.I.1994) (citing *State v. Leonardo,* 119 R.I. 7, 11, 375 A.2d 1388, 1390 (1977)). The ability of a defendant to meaningfully cross-examine the state's witnesses is "an essential element" of the due process guarantees of the United States and Rhode Island constitutions. *State v. Doctor,* 690 A.2d 321, 327 (R.I.1997) (quoting *State v. Veluzat,* 578 A.2d 93, 94 (R.I.1990)). However, an examiner's purview is not boundless, and cross-examination "may be circumscribed within reasonable parameters of relevance in the sound discretion of the trial justice." *State v. Warner,* 626 A.2d 205, 209 (R.I.1993) (citing *State v. Vento,* 533 A.2d 1161 (R.I.1987); *State v. Waite,* 484 A.2d 887 (R.I.1984); *State v. Cianci,* 430 A.2d 756 (R.I.1981)). A trial justice's exercise of discretion to limit the scope of cross-examination "is not reviewable ex-

cept for clear abuse, and only if it constitutes prejudicial error." *State v. Wright,* 817 A.2d 600, 610 (R.I.2003).

▮▮▮ In this vein, defendant's first assignment of error relates to the cross-examination of the Rocheleaus with respect to their actions in the parking lot that services both the Applebee's restaurant and the Stop and Shop. The trial justice sustained two objections to defense counsel's questions about how Joseph Rocheleau felt about the responsiveness of the Warwick Police Department and whether he wanted the police to "impound [the Pacifica's] license plate." Defense counsel made an offer of proof that Mr. Rocheleau would testify that he was "ticked off at the Warwick Police Department and that the evidence would show that it was he who was the aggressor, because it would lead to the conclusion that he was "where he shouldn't have been, touching property that wasn't his own, that he has absolutely no right to." The state, on the other hand, argued that Mr. Rocheleau's desire to have the plate "impounded" five hours before the altercation in the Beagle Club parking lot was irrelevant to the issue of self-defense, and that, in any event, the evidence would merely be cumulative.

▮▮▮ We cannot say that the trial justice abused his discretion by sustaining the state's objection after he found the proffered evidence was not relevant. It is beyond question that a defendant may, but need not, introduce evidence that the victim was the initial aggressor in order to further a claim of self-defense. *See, e.g., State v. Ventre,* 811 A.2d 1178, 1182 (R.I. 2002); *State v. Soto,* 477 A.2d 945, 949 (R.I.1984); *State v. Tribble,* 428 A.2d 1079, 1085 (R.I.1981). However, a trial justice may exclude otherwise relevant testimony if it would constitute the "needless presen-

tation of cumulative evidence."[7] *See* R.I. R. Evid. 403. As the trial justice noted here, the facts that Joseph and Susan Rocheleau had called the police, that they had waited a half-hour with no result, and that they later trespassed on the Beagle Club property in pursuit of the Pacifica already were in evidence. Consequently, we conclude that, even if the evidence bore some relevance to the issues before the court, there was no abuse of discretion in excluding it because the testimony would have been unnecessarily cumulative.

The defendant next argues that the trial justice erred when he ruled that Officer Matthew Barlow could not testify about defendant's out-of-court statement concerning the cause of his physical disability. In the course of its case, the state introduced through Officer Barlow defendant's written statement, in which he described the fight. In that statement, defendant said that Joseph and Susan "started making gay slurs" as he approached them and that during their fight in the car Joseph Rocheleau "went for [his] neck," which was "very volatile" because of serious prior injuries to his cervical vertebrae. Counsel then sought to elicit through Officer Barlow that defendant told him that he became disabled because he was the victim of a hate crime that occurred as he was leaving a gay club in downtown Providence in 1998. The state objected on the basis of hearsay; in response, defense counsel argued that the statement tended to show defendant's state of mind on the night of July 11, 2008.

In our opinion, this argument is strikingly similar to an issue raised in *State v. Bustamante,* 756 A.2d 758 (R.I. 2000). In *Bustamante,* the defendant was permitted to call a Woonsocket police officer to the witness stand for the purpose of providing a description of his "agitated state" as officers transported him from Vermont to Rhode Island. *Id.* at 763. However, the trial justice refused to allow the officer to testify concerning the defendant's statements about why he was agitated. *Id.* It was offered that the officer would have testified that Bustamante had told him that he believed that his uncle would kill him if he returned to Rhode Island. *Id.* at 763–64. This Court affirmed the trial justice's ruling, holding that "[a]lthough it is permissible for a defendant to introduce testimony concerning his or her state of mind, it is not permissible for 'the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind.'" *Id.* at 764 (quoting *United States v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980)). Here, defendant adopted the same strategy as the defendant in *Bustamante:* he attempted to elicit his own hearsay statements about why he may have been afraid of the Rocheleaus through the testimony of Officer Barlow. As was his absolute right, defendant chose not to take the stand at trial, but after having made that decision, "[h]e may not testify by other means, including by way of the unsworn statements made to police." *State v. Harnois,* 638 A.2d 532, 535–36 (R.I.1994) (citing *State v. Germano,* 559 A.2d 1031, 1036–37 (R.I.1989)). Consequently, there was no error on the part of the trial justice.

The defendant also argues that the trial justice improperly instructed the jury with respect to the existence of mutu-

**7.** This Court has defined "cumulative evidence" as evidence that tends "to prove the same point to which other evidence has been offered." *State v. Lynch,* 854 A.2d 1022, 1032 (R.I.2004) (quoting *State v. Coleman,* 239 Neb. 800, 478 N.W.2d 349, 358 (1992)).

al restraining orders between the parties. In response to a question by defense counsel about whether she ever contacted defendant before she went to the Beagle Club, Susan Rocheleau responded, "No. We have a restraining order against him, cannot talk to him." After this apparently unexpected revelation, a long discussion ensued outside the presence of the jury between counsel and the trial justice concerning the nature of the restraining order and the best means for fairly addressing Mrs. Rocheleau's response. The trial justice asked defense counsel whether he wanted the statement struck or to remain in the record. Defense counsel, without prompting from the trial justice, suggested an alternative: he asked that the jury be instructed that the restraining order was mutual. Over the *state's* objection, the trial justice instructed the jury that in March 2008, the Superior Court entered a mutual preliminary injunction against both defendant and the Rocheleaus, without a finding of responsibility or liability, and further that the trial did not involve a violation of that order.[8] In our opinion, the record reveals that defendant received precisely the instruction that he requested. Thus, his argument that it was "terribly unfair" to not instruct the jury that defendant initiated the 2008 proceeding is meritless.

We reach the same conclusion with respect to the defendant's argument that the trial justice "erred by not allowing defense counsel to examine the relevant documents pertaining to an investigation undertaken by the Department of Elderly Affairs * * *" (DEA). Before the trial commenced, in October 2009, the Superior Court granted the defendant's Super. R.Crim. P. 17(c) motion to subpoena records from DEA.[9] The DEA filed a motion to quash the subpoena, arguing that it was prohibited from releasing the records under state and federal law. On November 3, 2009, the Superior Court held a hearing on the motion to quash. During the hearing, defense counsel expressly represented to the trial justice that he was "not necessarily asking that [the records] be released" but that they merely be "released to the Court for their [*sic*] review for relevant statements * * *." Apparently in accordance with that request, the trial justice ruled that he would review the DEA documents *in camera* and "decide what portions, if any, may be provided to the defendant, with a copy to the State of Rhode Island." It appears from the record that the trial justice reviewed the records, but did not release any documents; he then ordered them to be resealed.[10] It does not appear from the record that the

8. Nevertheless, the trial justice took the unusual step of giving both the state and defendant an "exception" to his ruling.

9. Rule 17(c) of the Superior Court Rules of Criminal Procedure states:
   "A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

10. Additionally, on November 13, 2009, defendant returned and asked the trial justice to again review the document package, this time to determine whether there were any witness statements relating to a DEA investigation that occurred in March 2009. After again unsealing and reviewing the documents, the hearing justice reported that there were no records from 2009. The defendant concedes that there was no error in that review.

defendant articulated any objection to the trial justice's ruling. Nevertheless, before this Court, the defendant now argues that the trial justice should have allowed him to personally inspect the records, and that *in camera* review was insufficient. Succinctly stated, the defendant desires to "have his cake and eat it too." The record clearly indicates that the defendant received exactly the kind of review he requested from the trial justice. Therefore, there was no error.

## Conclusion

The defendant's judgment of conviction is affirmed. The papers in this case are remanded to the Superior Court.